**Stanley M. SHEPP, Appellant,**

v.

**Tracey L. SHEPP a/k/a Tracey L. Roberts, Appellee.**

Superior Court of Pennsylvania.

Submitted Jan. 6, 2003.

Filed April 7, 2003.

Dann S. Johns, York, for appellant.

Richard K. Konkel, York, for appellee.

Before: JOHNSON, ORIE MELVIN, and MONTEMURO,* JJ.

OPINION BY MONTEMURO, J.

¶ 1 This is an appeal from an Order delineating the legal and physical custody arrangements fashioned by the court for the parties' minor child, a girl whose date of birth is February 3, 1993. Two provisions of the Order supply the basis for the instant appeal: the first directs that the child be raised in the Church of Jesus Christ of Latter Day Saints (Mormon), and the second prohibits Appellant/Father from teaching the child about polygamy, plural marriages, or multiple wives.

¶ 2 The parties, who are both converts to the Mormon faith, married in June of 1992 and divorced in February of 2001. Shortly thereafter, Appellant, who considers himself a fundamentalist because of his belief in polygamy, was excommunicated by the Mormon Church. In January of 2002, Appellant filed a complaint seeking joint physical and legal custody, eventuating in a conciliation and an interim order. After mediation failed to resolve the issues, the trial court received evidence and entered the order now under consideration. This appeal followed.

¶ 3 In child custody cases, this Court's review is of the broadest type, and will not result in reversal absent a finding that the trial court has abused its discretion. *Tripathi v. Tripathi*, 787 A.2d 436, 439 (Pa.Super.2001). Moreover,

[T]he appellate court is not bound by the deductions or inferences made by the

* Retired Justice Assigned to Superior Court.

trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings[.]

*McMillen v. McMillen,* 529 Pa. 198, 602 A.2d 845, 847 (1992). Finally, "[i]t is well settled that the sole issue to be decided in a custody proceeding is the best interest and welfare of the child. This is determined on a case by case basis, considering all factors which legitimately impact upon the child's physical, intellectual, moral and spiritual well-being." *Siliquini v. Kegel–Siliquini,* 786 A.2d 275, 277 (Pa.Super.2001) (citations omitted).

¶ 4 In assigning error to the provisions of the custody Order concerning the teaching of polygamy and raising the child as a Mormon, Appellant argues that the trial court's directives interfere with his constitutional right to unrestricted practice of his religion, and his right and duty as a father "to discuss the spiritual dimension of [the fundamentalist Mormon] life with his daughter." (Appellant's Brief at 20). In this regard he relies on *Zummo v. Zummo,* 394 Pa.Super. 30, 574 A.2d 1130 (1990), in which this Court established the standard by which the legal right of parents in custody situations to instruct their children in religious practices is to be measured. In *Zummo* we reaffirmed, *inter alia,* the long standing principle that "the court will not interfere with the religious preferences of either parent." *Tripathi, supra,* at 440. Most critically, the *Zummo* court held that

to justify restrictions upon [a] parent's right to inculcate religious beliefs in their [sic] children, the party seeking the restriction must demonstrate by competent evidence that the belief or practice of the party to be restricted actually presents a substantial threat of present or future physical or emotional harm to the particular child ... involved in [the] absence of the proposed restriction, and that the restriction is the least intrusive means adequate to prevent the specified harm.

*Zummo, supra* at 1157.

¶ 5 In addition to arguing the Order's infringement of his rights, Appellant contends that the danger of harm to his daughter was insufficiently proven. Indeed, despite its findings that the practice espoused by Appellant is illegal, immoral, and illogical, and Appellant himself morally deficient, the trial court concluded that there was no evidence of a grave threat to the child.

■ ¶ 6 However, the issue in this matter, stated in the most basic way, is whether a parent, by advocating a religious practice which is prohibited by law, poses a substantial threat to his child. We find that he does, and that no jurisprudence requires this Court to countenance the hazard posed merely because it occurs in the context of proselytism. As Appellee correctly points out, the United States Supreme Court, addressing the issue of polygamy in a series of cases, has held that First Amendment protections do not extend to immoral or criminal acts despite their sanction by religious doctrine. *See Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1878). Indeed, the Court has categorized even the advocacy of criminalized religious practices as itself a crime since, "to teach, advise and counsel their practice is to aid in their commission, and

such teaching and counseling are themselves criminal and proper subjects of punishment, as aiding and abetting crime are in other cases." *Davis v. Beason,* 133 U.S. 333, 347, 10 S.Ct. 299, 33 L.Ed. 637 (1890). Appellant has advanced no countervailing authority despite the antiquity of this ruling.

¶ 7 Moreover, unlike the situation in *Zummo,* where the parents were of differing but traditional religion beliefs and the issue was one of primacy, the conflict here does not involve competition or incompatibility between theological systems; the harm is not merely confusion or uncertainty produced by incompatible ideologies. Thus, the resolution in *Zummo* presents an imperfect analogue. Further, the orthodoxy or otherwise of Appellant's beliefs is not before the court, nor is his constitutional right to hold those beliefs so long as he does not act on them; only the effects of his exposing a minor child to an illegal practice is being assessed. In this context, Appellant's method of presentation is also worthy of note, given that he informed a wife candidate, his 14 year old stepdaughter, a witness whose testimony was accepted as true by the trial court, that she would "go to hell" unless she practiced what he preached. The question whether we would find similarly benign advocacy of drug abuse or child prostitution were they presented as foundational religious beliefs is no question at all.

■ ¶ 8 As already noted, this Court has consistently recognized the moral and spiritual dimension involved in an award of primary custody. *See also Boylan v. Boylan,* 395 Pa.Super. 280, 577 A.2d 218 (1990); Wilder, *Pa. Family Law Prac. and Pro.,* 3rd ed., § 28–13, at 321 ("It is appropriate for the court to consider religious practices in custody disputes because the child's spiritual welfare is a consideration in custody cases.") Thus, our province is not "[to] render[ ] a value judgment on the intrinsic truths of the various religious beliefs, **but confine our investigation solely to any detrimental effect their practice may have on the development of the child.**" *Morris v. Morris,* 271 Pa.Super. 19, 412 A.2d 139, 144 (1979) (emphasis added). Appellant's promotion of his beliefs to his stepdaughter involved not merely the superficial exposure of a child to the theoretical notion of criminal conduct, but constituted a vigorous attempt at moral suasion and recruitment by threats of future punishment. The child was, in fact, warned that only by committing an illicit act could she comply with the requirements of her religion.

¶ 9 Appellant's intent with his own daughter too, as the trial court clearly perceived from his testimony, is to inculcate in his child a belief in what he knows to be illegality. His instruction may perhaps, as the child matures, even become insistence that she engage in such conduct. The difference between the two involvements is vast, since the first, while undesirable, does not, unlike the latter, constitute indoctrination in a practice which the Commonwealth has determined to be criminal. Pennsylvania law, with its focus on the best interests of the child, does not obligate us to facilitate Appellant's efforts.

¶ 10 The court's factual findings as to the nature of the practice endorsed by Appellant and as to Appellant's own character render its conclusion that Appellant poses no grave threat to his daughter both erroneous and unreasonable. However, the court's solution, to prohibit the teaching of polygamy, is neither since it represents "the least intrusive means," *Zummo, supra,* of implementing the court's objective. Since we may affirm on any grounds, *Espenshade v. Espenshade,* 729 A.2d 1239, 1246 n. 5 (Pa.Super.1999), we approve the trial court's Order on this point.

¶ 11 As for Appellant's challenge to the trial court's directive that the child be raised as a Mormon,[1] his failure to advance any argument or cite any supporting authority on the subject enables us to deem the issue waived. Pa.R.A.P. 2119(a); *Drum v. Shaull Equip. & Supply Co.*, 787 A.2d 1050, 1059 (Pa.Super.2001), *appeal denied*, 569 Pa. 693, 803 A.2d 735 (2002).

¶ 12 Accordingly, the trial court's Order is affirmed.

¶ 13 Order affirmed.

¶ 14 JOHNSON, J. files a Dissenting Opinion.

## DISSENTING OPINION BY JOHNSON, J.

¶ 1 I respectfully dissent. In my opinion, the trial court acted beyond the permissible scope of its discretion when in the wake of its determination that there was no evidence that Stanley M. Shepp (hereinafter "Father") was a grave threat to his child it prohibited Father from teaching his child about a fundamental tenet of Father's faith. Because the trial court's order violated this Court's ruling in *Zummo v. Zummo*, 394 Pa.Super. 30, 574 A.2d 1130 (1990), which established the legal standard for determining parental rights of religious indoctrination in child custody situations, I would reverse the portion of the trial court's order that failed to comply with the law of this Commonwealth as pronounced in *Zummo* and in all other respects, affirm the order.

¶ 2 In the case at bar, Father appeals from the trial court's order and raises the following issues for this Court's determination:

I. DID THE TRIAL COURT ERR IN PROHIBITING FATHER FROM TEACHING DAUGHTER ABOUT PO-LYGAMY, PLURAL MARRIAGES OR MULTIPLE WIVES?

II. DID THE TRIAL COURT ERR IN DIRECTING THAT THE CHILD BE RAISED IN THE LATTER DAY SAINTS CHURCH?

Brief for Appellant at 13. In support of his first question, Father contends that it is "his duty, and his right, to discuss the spiritual dimensions of [his] life with his daughter." Brief for Appellant at 20. Father also asserts that the trial court erred because there was insufficient evidence to establish that exposure to either conversations or teachings about Mormon polygamy, which is a central tenet of Father's religious belief system as a fundamentalist Mormon, would be harmful to K.M.S. Brief for Appellant at 25. I agree with Father's contentions concerning the insufficiency of evidence.

¶ 3 In *Morris v. Morris*, 271 Pa.Super. 19, 412 A.2d 139 (1979), this Court emphasized that "we neither intend to, nor are capable of, rendering a value judgment on the intrinsic truth of the varied religious beliefs, **but confine our investigation solely to any detrimental effect their practice may have on the development of the child.**" *Id.* at 144 (emphasis added). In instances where both parents demonstrate a desire to promote the religious education of the child, each in his or her own faith, this Court assumes a neutral stance on the issue. *See Rinehimer v. Rinehimer*, 336 Pa.Super. 446, 485 A.2d 1166, 1168 (1984).

¶ 4 This case is about whether Father may communicate with his minor daughter about his religious belief in a criminalized practice. In *Zummo*, this Court articulated the standard for determining whether a parent's right to religious indoctrination should be restricted. *See Zummo*, 574

---

**1.** The child was baptized in the Church of Latter Day Saints.

A.2d at 1140. Under the rubric of *Zummo*, the laws of this Commonwealth give each parent full parental authority during lawful periods of custody or visitation. *See id.* "Consequently, such a parent may pursue whatever course of religious indoctrination which that parent sees fit, at that time, during periods of lawful custody or visitation." *Id.* "If the other parent objects and seeks restrictions, the objecting parent must establish a substantial risk of harm in the absence of the restriction proposed." *Id.*

> [I]n order to justify restrictions upon parent's rights to inculcate religious beliefs in their children, the party seeking the restriction must demonstrate by competent evidence that the belief or practice of the party to be restricted actually presents a substantial threat of present or future physical or emotional harm to the particular child or children involved in the absence of the proposed restriction, and that the restriction is the least intrusive means adequate to prevent the specified harm.

*Id.* at 1157 (emphasis added). This standard requires evidence of a "substantial threat" rather than "some probability." *Id.* at 1155. Thus, while the injury involved may be either "present or future harm, the speculative possibility of mere disquietude, disorientation, or confusion arising from exposure to contradictory religions would be a patently insufficient 'emotional harm' to justify encroachment by the government upon constitutional parental and religious rights of parents, even in the context of divorce." *Id.*

¶ 5 In the instant case, the trial court was in the best position to determine the effects of exposing the minor child to teaching regarding polygamy. In reference to this issue, the trial court specifically stated that "while we may have evidence of moral deficiency of [F]ather because of his belief in having multiple wives, **there has been no evidence of a grave threat to the child in this case.**" Trial Court Opinion & Order, 5/6/02, at 6 (emphasis added). In light of the trial court's conclusion, that there was no competent evidence of a substantial threat or harm to the child, the court had no legal basis to render an order that restricted Father's ability to communicate with his child about Mormon polygamy.

¶ 6 The Majority premises its decision to affirm the trial court's order on the fact that the practice of polygamy is a crime in this Commonwealth. I agree that the First Amendment protections do not extend to criminal acts despite their sanction by religious doctrine. However, I do not agree that "teaching and counseling [criminalized religious practices] are themselves criminal and proper subjects of punishment, as aiding and abetting crime are in other cases." *See Davis v. Beason*, 133 U.S. 333, 347, 10 S.Ct. 299, 33 L.Ed. 637 (1890). Moreover, the United Supreme Court has expressly negated consideration of whether a citizen advocates a criminalized practice as a limitation on the exercise of other substantive rights. *See Romer v. Evans*, 517 U.S. 620, 635, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (citing *Davis*, 133 U.S. at 347, 10 S.Ct. 299). In *Davis*, the Court upheld the constitutionality of an Idaho statute that denied "Mormons, polygamists, and advocates of polygamy the right to vote and to hold office because, as the Court construed the statute, 'it simply excludes from the privilege of voting, or of holding any office of honor, trust or profit, those who have been convicted of certain offences [sic], and those who advocate a practical resistance to the laws of the Territory and justify and approve the commission of crimes forbidden by it.'" *Id.* In *Romer*, the Court concluded that "to the extent *Davis* held that persons advocating a certain practice may be denied the right

to vote, it is no longer good law." *Id.* Thus, the conclusion that the avocation of criminalized religious practices is itself criminal is not the law.

¶ 7 I agree with the Majority's conclusion that if Father were to initiate or engage in a polygamous relationship that he would be in express violation of the law of this Commonwealth. *See Reynolds v. United States,* 98 U.S. 145, 166, 25 L.Ed. 244 (1878) (concluding that governmental laws cannot interfere with religious beliefs and opinions, but they may interfere with illegal practices). *See also Morris,* 412 A.2d at 142 (determining that while the adoption of a belief is absolutely protected, there exists only a qualified right to act on that belief). However, I am unable to concur in the Majority's determination that the illegality of the practice of polygamy prevents Father from discussing the concept with his minor daughter. As stated in *Zummo,* each parent is free to pursue whatever course of religious indoctrination they see fit during periods of lawful custody or visitation. *See id.* at 1140. This Court will stringently uphold that parental right, unless the party seeking a restriction demonstrates by competent evidence that the religious belief or practice in question presents a substantial threat of present or future physical or emotional harm to a particular child. *See id.* Thus, while the laws of this Commonwealth explicitly prohibit Father from engaging in a polygamous marriage even though the practice is embraced by his religion, there is no correlating law that permits the trial court to forbid Father from instructing his daughter about this aspect of the fundamentalist Mormon doctrine without a demonstration by competent evidence of a substantial threat or harm to the child in the absence of the proposed restriction. Accordingly, I would reverse the portion of the trial court's order that failed to comply with the law of this Commonwealth as pronounced in *Zummo.* In all other respects, I would affirm the order.