906 A.2d 1165

**Stanley M. SHEPP, Appellant,**

v.

**Tracey L. SHEPP a/k/a Tracey L. Roberts, Appellee.**

Supreme Court of Pennsylvania.

Argued May 13, 2004.

Decided Sept. 27, 2006.

692

Dann Stuart Johns, Esq., for Stanley M. Shepp.

Richard Karl Konkel, Esq., York, Tracey L. Shepp.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Justice NEWMAN.

We granted allocatur in this case to consider the extent to which courts can limit parents from advocating religious beliefs that, if acted upon, would constitute criminal conduct.

### *Facts and Procedural History*

Stanley M. Shepp (Father) and Tracey L. Shepp, a/k/a Tracey L. Roberts (Mother) married in June of 1992. They converted to the Mormon faith prior to their marriage.[1] Their child, Kaylynne Marie Shepp (Kaylynne), whose custody is at issue in this case, was born on February 3, 1993. The parties separated in April of 2000, and they divorced in February of 2001. Shortly after the divorce, the Mormon Church excommunicated Father because he is a fundamentalist who believes in polygamy.[2]

Following the parties' separation, Kaylynne lived with Mother and her three other daughters from previous marriages. On January 2, 2002, Father filed a Petition seeking an order of shared legal and physical custody of Kaylynne. The trial court issued an Interim Order for Custody on January 30, 2002, which provided that the parties would share legal custody and that Mother would have primary physical custody. The Interim Order notes, "Father's position is that he requests primary physical custody, although the Petition does

---

1. The official name of the Mormon Church is the Church of Jesus Christ of Latter-day Saints.

2. " 'Mormon Fundamentalism' denotes the beliefs and practices of contemporary schismatic groups that claim to follow the teachings of the Prophet Joseph Smith. The Fundamentalist movement began after the issuance of the Manifesto of 1890, which publicly declared an official end to plural marriage in The Church of Jesus Christ of Latter-day Saints. Fundamentalists held that God requires all 'true' believers to abide by the principle of polygamy, irrespective of Church mandate.... The thread that binds all Fundamentalists together is their belief that the LDS Church has improperly changed doctrines and practices." Abstracted from J. Max Anderson, "Fundamentalists" in *Encyclopedia of Mormonism*, ed. Daniel H. Ludlow, 4 vols. (New York: Macmillan, 1992), 2:531–32. Abstract prepared by Brigham Young University Studies staff and interns at http://ldsfaq.byu.edu/view.asp?q=316 (last visited January 19, 2006).

indicate shared physical custody." Order dated January 30, 2002, at 3.

The trial court held a hearing on May 6, 2002. Father testified that he practices Mormon fundamentalism and the teachings of Joseph Smith and Brigham Young. He further stated that fundamentalism "includes plural marriage." Notes of Testimony (N.T.), dated May 6, 2002, at 72. He testified that he has not set a limit on the number of wives he would like to have, but would have no problem with additional wives if they love his family and get along. *Id.* at 107. With respect to discussing plural marriage with Kaylynne, Father stated that he has told the child of the possibility that she could have another mother who comes into the family through plural marriage. *Id.* at 75. He indicated his belief that it is important for children to know, while they are young, about any lifestyle the family may practice, rather than to "all of a sudden pop something on them like that" when they are seventeen. *Id.* When asked if he would try to marry Kaylynne into a polygamist relationship, he replied that he would not, but that in order for her to be happy, she has to have choices, and that as a father it is his job to help her learn about and understand alternatives. *Id.* at 77–78.[3] Father's

**3.** Father's testimony was as follows:

Question: As part of your fundamentalist Mormon philosophy, would you try to marry off Kaylynne into a polygamist relationship?
Answer: There is no way. Kaylynne has the same agency that anybody has. I can't marry her off any more than I could marry off anybody.

N.T. at 77–78. In his Dissenting Opinion, Mr. Justice Baer, purporting to correct this Court as to the facts, indicates that the trial court concluded that Father " 'clearly would' seek to act and use his parental control to convince Child to act illegally and immorally. *Id.* at 709, 906 A.2d at 1176." In making this assertion, Mr. Justice Baer quotes two words from the Opinion of the trial court, i.e., "clearly would." and then supplies his interpretation. However, these two words appear in a broader passage:

We have also taken into consideration character, conduct, and fitness.
Both of the parties seem to have adequate character, conduct, and fitness, with one exception, and that is the fact that father acknowledges a belief in polygamy. That belief, if he would follow through with it, would be not only illegal in Pennsylvania, it would be immoral and illogical.

current wife testified that she accepts the idea of plural marriage and that she is comfortable with the idea of participating in a family with more than one mother. She stated that there are no plans at the present time for her marriage to become a plural marriage. *Id.* at 123.

Mother testified that Father's belief in polygamy was the reason for the parties' divorce. She stated that Father would like to have five wives, *id.* at 13, and expressed concerns that he would introduce Kaylynne to men so that she would be ready to engage in polygamy once she reaches the age of thirteen. *Id.* at 16. She stated that she did not wish her daughter to interact with polygamist families or "to be taught polygamy in any way." *Id.*

Manda Lee (Manda), Mother's daughter from a previous marriage, testified that when she was thirteen years old, Father (who is her stepfather) told her "that if you didn't practice polygamy or you didn't agree with it, but mostly if you didn't practice it, that you were going to hell." *Id.* at 164. She further testified that Father told her that in Pennsylvania a fourteen-year old can get married with a parent's permission, and "since I was already living in the house and we were already related, that it would be a good idea for us to be married." *Id.* at 165.[4] On rebuttal, Father denied Manda's

The issue is not having such a belief, but his interest in pursuing this belief, which the testimony indicates that he clearly would.

Trial Court Opinion at 5. Thus, facially, it is less than evident that the court intended to memorialize a finding that Father would coerce Kaylynne into practicing polygamy. Indeed, in context it appears more plausible that the court was discussing Father's own marital plans. Moreover, to the extent that there is any ambiguity, the trial court's subsequent pronouncement clarifies the point:

While we may have evidence of moral deficiency of father because of his belief in having multiple wives, there has been no evidence of a grave threat to the child in this case.

*Id.* at 6. The conclusion that there has been no evidence of a grave threat to the child would be difficult to explain if the court had previously found that Father "clearly would" coerce Kaylynne into polygamy, a practice that it has already noted was "illegal," "immoral," and "illogical."

**4.** Section 1304(b)(1) of the Marriage Law, 23 Pa.C.S. § 1304(b)(1), provides, "No marriage license may be issued if either of the applicants for a license is under 16 years of age unless the court decides that it is

allegation that he suggested they participate in a polygamous relationship. *Id.* at 175.

At the conclusion of the hearing, the trial court noted:

Contact [between a parent and a child] can be limited only when the parent has been shown to suffer from severe mental or moral deficiencies that constitute a grave threat to the child.

While we may have evidence of moral deficiency of [F]ather because of his belief in having multiple wives, there has been no evidence of a grave threat to the child in this case.

*Id.* at 180. In its final Order, the court awarded joint legal custody to both parents, and primary physical custody to Mother. Noting that the parties had raised Kaylynne in the Mormon faith, the court directed, "the child will continue with that religious upbringing." *Id.* at 181. However, the court ordered, "Father is specifically prohibited while the child is a minor from teaching her about polygamy, plural marriages or multiple wives." *Id.*

Father filed a timely appeal to the Superior Court, which affirmed the decision of the trial court. However, the Superior Court disagreed with the conclusion of the trial court, stating, "[t]he court's factual findings as to the nature of the practice endorsed by [Father] and as to [Father's] own character render its conclusion that [Father] poses no grave threat to his daughter both erroneous and unreasonable." *Shepp v. Shepp*, 821 A.2d 635, 638 (Pa.Super.2003). The Superior Court made this determination based on the following facts elicited during the testimony of Father's stepdaughter, which the trial court and the Superior Court deemed credible:

[Father's] promotion of his beliefs to his stepdaughter involved not merely the superficial exposure of a child to the theoretical notion of criminal conduct, but constituted a vigorous attempt at moral suasion and recruitment by threats of future punishment. The child was, in fact,

to the best interest of the applicant and authorizes the issuance of the license."

warned that only by committing an illicit act could she comply with the requirements of her religion.

*Id.* The court further expressed concern that Father's intention to inculcate a belief in polygamy in his own daughter "may perhaps, as the child matures, even become insistence that she engage in such conduct." *Id.* While recognizing the difference between discussion and coercion, the court held that the best interests of the child would be served by restricting Father from discussing polygamy with Kaylynne until she is eighteen years old.

## *Discussion*

This case implicates two highly important values: the free exercise of religion as guaranteed by the First Amendment to the Constitution of the United States and the public policy of this Commonwealth, as set forth in Section 5301 of the Domestic Relations Code, "when in the best interest of the child, to assure a reasonable and continuing contact of the child with both parents after a separation or dissolution of the marriage and a sharing of the rights and responsibilities of child rearing by both parents." 23 Pa.C.S. § 5301.

The essence of Father's position is that he is simply a parent who wishes to share his sincere religious beliefs with his child. In support of his view that the courts may not interfere with this right, he relies on *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). In *Yoder,* the United States Supreme Court affirmed a decision of the Supreme Court of Wisconsin, which held that the convictions of Amish parents for violating the State's compulsory school attendance law were invalid pursuant to the First Amendment to the United States Constitution. Although the relevant statute required that all children between the ages of seven and sixteen attend school, Yoder and other parents refused to send their children to school beyond the eighth grade. The United States Supreme Court recognized the importance of the State's interest in universal education, but nevertheless concluded that such interest "is not totally free from a balancing process when it impinges on fundamental rights and

interests, such as those specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children." *Id.* at 214, 92 S.Ct. 1526. Furthermore, "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Id.* at 215, 92 S.Ct. 1526.

Based on a review of the record, the United States Supreme Court noted that the Amish way of life, which the parents wished to maintain by prohibiting formal education beyond the eighth grade, was a matter of deep religious conviction. The Court stated:

> [T]he Court's holding in *Pierce [v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) ] stands as a charter of the rights of parents to direct the religious upbringing of their children. And, when the interests of parenthood are combined with a free exercise claim of the nature revealed by this record, more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement under the First Amendment.

*Id.* at 233, 92 S.Ct. 1526. Unchallenged expert testimony established that the "enforcement of the State's requirement of compulsory formal education after the eighth grade would gravely endanger if not destroy the free exercise of respondents' religious beliefs." *Id.* at 219, 92 S.Ct. 1526. The United States Supreme Court determined that exposing Amish children to the worldly influences of secondary school "contravenes the basic religious tenets and practice of the Amish faith, both as to the parent and the child." *Id.* at 218, 92 S.Ct. 1526. The State maintained that its interest in compulsory education was "so compelling that even the established religious practices of the Amish must give way." *Id.* at 221, 92 S.Ct. 1526. The Court disagreed, noting that "[w]here fundamental claims of religious freedom are at stake ... we must searchingly examine the interests that the State seeks to promote...." *Id.* Because the record established that persons who practice the Amish faith are able to fulfill their responsi-

bilities of citizenship without compulsory education beyond the eighth grade, and receive vocational education that allows them to be self-reliant, the Court determined that Yoder had introduced "persuasive evidence undermining the arguments the State ha[d] advanced to support its claims in terms of the welfare of the child and society as a whole." *Id.* at 234, 92 S.Ct. 1526. The United States Supreme Court concluded by explaining that accommodating the religious objections of the Amish by foregoing an additional year or two of secondary education would not impair the health of the children or in any way harm society.[5]

In the case *sub judice*, Father asserts that where the State interferes in matters of religious speech between parent and child, such action is subject to strict scrutiny, or a showing that a compelling governmental interest outweighs the fundamental right of a parent to make decisions concerning a child's upbringing.

Mother disagrees with Father's position that polygamy is a constitutionally protected practice within a religious context. In the nineteenth century, the United States Supreme Court issued four decisions in which it took a firm position against Mormon polygamy: *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1878); *Murphy v. Ramsey*, 114 U.S. 15, 5 S.Ct. 747, 29 L.Ed. 47 (1885); *Davis v. Beason*, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1890); *Late Corp. of the Church of Latter Day–Saints v. United States*, 136 U.S. 1, 10 S.Ct. 792, 34 L.Ed. 478 (1890). See, Keith E. Sealing, *Polygamists Out*

---

**5.** In *Yoder*, the United States Supreme Court referred to *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), in which the appellant, a member of the Seventh-day Adventist Church, was dismissed from her job because she refused to work on Saturday, which her religion considers the Sabbath. Unable to find employment that would not require her to work on Saturday, she sought unemployment compensation benefits. The South Carolina Employment Security Commission denied benefits because the appellant failed to accept suitable work when offered. The Court of Common Pleas for Spartanburg County and the South Carolina Supreme Court affirmed the decision of the Commission. The United States Supreme Court reversed. The Court effectively created a balancing test that any burden on the free exercise of the appellant's religion must be justified by a compelling state interest.

*of the Closet: Statutory and State Constitutional Prohibitions Against Polygamy are Unconstitutional Under the Free Exercise Clause,* 17 Ga. St. U.L.Rev. 691, 710–710 (2001). The *Reynolds* Court referred to polygamy as "odious among the northern and western nations of Europe." *Reynolds,* 98 U.S. at 164. The *Late Corp.* Court stated that Mormon polygamy is "a crime against the laws, and abhorrent to the sentiments and feelings of the civilized world." 136 U.S. at 48, 10 S.Ct. 792. In *Davis,* the Court upheld a law in the territory of Idaho that required an individual registering to vote to swear or affirm, *inter alia,* that he was not a bigamist or a polygamist, was not a member of an order that practices bigamy or polygamy, and that he did not and would not counsel or advise others to commit bigamy or polygamy.[6] The Court stated:

> Bigamy and polygamy … are crimes by the laws of the United States, and they are crimes by the laws of Idaho. … If they are crimes, then to teach, advise, and counsel their practice is to aid in their commission, and such teaching and counseling are themselves criminal, and proper subjects of punishment, as aiding and abetting crime are in all other cases.

*Davis,* 133 U.S. at 341–42, 10 S.Ct. 299.

Plural marriage is a crime in Pennsylvania. Section 4301 of the Crimes Code, 18 Pa.C.S. § 4301 provides:

> (a) Bigamy.—A married person is guilty of bigamy, a misdemeanor of the second degree, if he contracts or purports to· contract another marriage, unless at the time of the subsequent marriage:

6. In *Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996), the United States Supreme Court stated:

 To the extent *Davis* held that persons advocating a certain practice may be denied the right to vote, it is no longer good law. *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). To the extent, it held that the groups designated in the statute may be deprived of the right to vote because of their status, its ruling could not stand without surviving strict scrutiny, a most doubtful outcome. *Dunn v. Blumstein,* 405 U.S. 330, 337, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); cf. *United States v. Brown,* [381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484] (1965), *United States v. Robel,* 389 U.S. 258, [ 88 S.Ct. 419, 19 L.Ed.2d 508] (1967).

 *Id.* at 634, 116 S.Ct. 1620 (citations modified).

(1) the actor believes that the prior spouse is dead;

(2) the actor and the prior spouse have been living apart for two consecutive years throughout which the prior spouse was not known by the actor to be alive; or

(3) a court has entered a judgment purporting to terminate or annul any prior disqualifying marriage, and the actor does not know that judgment to be invalid.

(b) Other party to bigamous marriage.—A person is guilty of bigamy if he contracts or purports to contract marriage with another knowing that the other is thereby committing bigamy.

In the instant matter, the illegal nature of polygamy becomes important when determining the appropriate level of scrutiny to apply to Father's free exercise claim. The decision of the United States Supreme Court in *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (*Smith II*), is critical to this issue. Alfred Smith (Smith) and Galen Black (Black) were fired from their employment with a private drug rehabilitation organization because they ingested peyote while participating in a religious ceremony of the Native American Church. Pursuant to the relevant Oregon statute, persons in possession of peyote are guilty of a felony. Smith and Black applied for unemployment compensation benefits, which the Employment Division denied because their employer had discharged them for work-related misconduct. The Oregon Court of Appeals reversed based on its conclusion that the denial of benefits violated the free exercise rights of Smith and Black as protected by the First Amendment. The Oregon Supreme Court affirmed, holding that the criminality of the use of peyote was irrelevant because the purpose of the misconduct provision, pursuant to which the Employment Division denied relief, was not to enforce criminal laws, but to preserve the financial stability of the unemployment compensation fund. The Oregon Supreme Court held that this purpose did not justify the burden that denial of compensation placed on the religious practice of Smith and Black. On appeal, *Employment Division, Department of Human Re-*

sources of *Oregon v. Smith,* 485 U.S. 660, 108 S.Ct. 1444, 99 L.Ed.2d 753 (1988) (*Smith I*), the United States Supreme Court held, "if a State has prohibited through its criminal laws certain kinds of religiously motivated conduct without violating the First Amendment, it certainly follows that it may impose the lesser burden of denying unemployment compensation benefits to persons who engage in that conduct." *Id.* at 670, 108 S.Ct. 1444. However, because the Oregon Supreme Court had not determined whether an exception to the controlled substance law existed for the sacramental use of peyote, the United States Supreme Court vacated the judgment and remanded to the Oregon Supreme Court for further proceedings. On remand, the Oregon Supreme Court held that there was no sacramental use exception to the criminal statute. It then determined that the prohibition was invalid pursuant to the Free Exercise Clause and, accordingly, reaffirmed its previous ruling.

The Employment Division again sought *certiorari,* which the United States Supreme Court granted. The Court, in an Opinion by Justice Scalia, reversed, determining that the *Sherbert* test, which requires a compelling government interest, does not apply where the challenged State action that is claimed to inhibit the free exercise of religion is a generally applicable criminal law. The Court noted:

> The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, 'cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development.' To make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs, except where the State's interest is "compelling"—permitting him, by virtue of his beliefs, 'to become a law unto himself,' *Reynolds v. United States,* 98 U.S. at 167—contradicts both constitutional tradition and common sense.

*Smith II,* 494 U.S. at 885, 110 S.Ct. 1595 (internal citation

omitted).[7]

Like the Oregon law prohibiting the use of peyote, the Pennsylvania statute prohibiting bigamy is a law of general application. Therefore, pursuant to *Smith II*, a neutral law criminalizing polygamy overrides a claim that such law places an improper limitation on the free exercise of religion. Based on *Smith II*, Mother asserts, "[s]ince 18 Pa.C.S. § 4301 is a valid and otherwise neutral law, it follows that the Commonwealth of Pennsylvania has the right to enforce, regulate, and prohibit such conduct or speech that may be incidental to such conduct, whether it be the use of peyote, enforcement of social security taxes, or the practice of polygamy." Brief of Appellee at 14 (citation modified).

*Smith II* further recognized:

> The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press ... or the right of parents, acknowledged in *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), to direct the education of their children, see *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)....

494 U.S. at 881, 110 S.Ct. 1595. Justice Scalia referred to such claims as presenting "a hybrid situation[,]" *id.* at 882, 110 S.Ct. 1595 which is subject to strict scrutiny. *Id.* at 881 n. 1, 110 S.Ct. 1595 (reaffirming a higher level of scrutiny for cases involving a free exercise claim made in conjunction with other constitutional protections, such as the right of a parent to direct the upbringing and education of his child). The instant matter, combining free exercise claims with the fundamental

---

7. In a Concurring Opinion, Justice O'Connor expressed her belief in the continued viability of the *Sherbert* test, noting that "[t]here is nothing talismanic about neutral laws of general applicability or general criminal prohibitions, for laws neutral toward religion can coerce a person to violate his religious conscience or intrude upon his religious duties just as effectively as laws aimed at religion." *Smith II*, 494 U.S. at 901, 110 S.Ct. 1595 (O'Connor, J., concurring).

right of parents to raise their children, is a hybrid case. As such, *Smith II,* which presents a "free exercise claim unconnected with any communicative activity or parental right;" *id.,* does not directly answer the question of whether a court may prohibit a parent from advocating religious beliefs, which, if acted upon, would constitute a crime.

 In light of the fact that *Smith II* does not apply to hybrid cases, we must reject the position advanced by Mother that a court may prohibit a parent from discussing religious beliefs with a child solely because acting upon those beliefs would result in the commission of a crime. Instead, we believe that *Yoder* provides the appropriate standard by which to consider the issue before us. As previously noted, "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Yoder,* 406 U.S. at 215, 92 S.Ct. 1526. Based on the record before us, it is clear that the Commonwealth's interest in promoting compliance with the statute criminalizing bigamy is not an interest of the "highest order" that would supersede the interest of a parent in speaking to a child about a deeply held aspect of his faith. However, this does not end our inquiry because *Yoder* also provides:

> To be sure, the power of the parent, even when linked to a free exercise claim, may be subject to limitation under *Prince [v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944),] if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens.

*Id.* at 233–34, 92 S.Ct. 1526. *Yoder* recognized that government has an interest in protecting "the physical or mental health of the child." *Id.* at 230, 92 S.Ct. 1526. Applying strict scrutiny,

> "The Government may ... regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest. We have recognized that there is a compelling interest in protecting the physical and psychological well-being of minors."

*Sable Communications of California v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989). The state's compelling interest to protect a child in any given case, however, is not triggered unless a court finds that a parent's speech is causing or will cause harm to a child's welfare. *Cf. Denver Area Educational Telecommunications Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 765–66, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996).

■ In the instant matter, the trial court determined that Father believed in polygamy, and that acting on that belief "would be not only illegal in Pennsylvania, but would also be immoral and illogical." N.T., May 6, 2002, at 179. The court noted that Father had approached his stepdaughter and "informed her that she would go to hell if she did not believe in polygamy," *id.* at 180, and that the stepdaughter recalled that Father "had suggested that when she became of age, that they would perhaps be married." *Id.* Nevertheless, the trial court stated that there was, "no evidence of a grave threat to the child in this case." Notes of Testimony, May 6, 2002 at 181. Engaging in speculation that Father's statements to his stepdaughter might lead to insistence that his own child engage in polygamy, the Superior Court improperly substituted its judgment for that of the trial court, and concluded that the teaching of plural marriage constituted a grave threat. In light of the fact that the trial court did not find a grave threat, it erred in restricting Father from teaching Kaylynne about polygamy.

By their very nature, decisions involving child custody must focus on the character and conduct of the individual parents and children involved. Accordingly, there may be instances where restricting a parent from teaching a child about a sincere religious belief involving illegal conduct is appropriate. However, we emphasize that the illegality of the proposed conduct on its own is not sufficient to warrant the restriction. Where, as in the instant matter, there is no finding that discussing such matters constitutes a grave threat of harm to the child, there is insufficient basis for the court to infringe on

a parent's constitutionally protected right to speak to a child about religion as he or she sees fit.

## Conclusion

■ For these reasons, we conclude that a court may prohibit a parent from advocating religious beliefs, which, if acted upon, would constitute a crime. However, pursuant to *Yoder*, it may do so only where it is established that advocating the prohibited conduct would jeopardize the physical or mental health or safety of the child, or have a potential for significant social burdens. Because such harm was not established in this case, there was no constitutional basis for the state's intrusion in the form of the trial court's Order placing a prohibition on Father's speech. That being the case, the second facet of the strict scrutiny test—whether the trial court's Order was narrowly tailored to achieve a compelling end—was not implicated. Accordingly, we reverse the Order of the Superior Court.

Chief Justice CAPPY and Justice CASTILLE and SAYLOR join the opinion.

Former Justice NIGRO did not participate in the decision of this case.

Justice EAKIN files a concurring opinion.

Justice BAER files a dissenting opinion.

Justice EAKIN, concurs.

I agree with the majority that the Superior Court improperly substituted its judgment for that of the trial court when it concluded the teaching of plural marriage was a grave threat, when the trial court found such teaching was not a grave threat. *See* Majority op., at 1173. The Superior Court's error is a sufficient basis for this Court to reverse the Superior Court's order. *Botek v. Mine Safety Appliance Corp.*, 531 Pa. 160, 611 A.2d 1174, 1176–77 (1992) (Superior Court not free to substitute its judgment for that of trial court). However, I do not join the majority's constitutional analysis.

If a constitutional analysis were necessary, I have misgivings about the application of the strict scrutiny test here. This is not a case where the government, as a party, is alleged to have infringed upon another party's fundamental constitutional right. The government is not a party; the parties are the biological parents of their daughter. Each parent has a fundamental constitutional right to make decisions concerning the care, custody, and control of their daughter. *See Troxel v. Granville,* 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Presumably, any government infringement upon either parent's fundamental right to raise daughter would require strict scrutiny be employed to evaluate such an infringement. *See id.,* at 80, 120 S.Ct. 2054 (Thomas, J., concurring). Father wants to teach daughter about plural marriage; mother does not want daughter to be so taught. With the parents in conflict concerning how daughter should be raised in this regard and with each having an equivalent fundamental right to direct daughter's upbringing, I would conclude the fundamental rights of one parent are not superior to the fundamental rights of the other. For analytical purposes, they "cross-out" one another, leaving us with an analysis based on the best interests of the child—the hallmark of every custody matter—without applying strict scrutiny.

Applying strict scrutiny to the trial court's order based upon father's First Amendment rights gives him a tremendous advantage in the custody dispute over whether daughter should be taught about plural marriage, since the strict scrutiny test is rarely met. *Burson v. Freeman,* 504 U.S. 191, 200, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (noting "a law rarely survives [strict] scrutiny"). However, applying strict scrutiny to the trial court order makes mother's fundamental right to raise daughter without learning about plural marriage substantially less valuable than father's fundamental right to teach her about plural marriage. To ensure that neither parent's fundamental rights are improperly devalued, I would apply a "cross-out" analysis that would not strictly scrutinize the trial court order, thus providing the trial court's decision appropriate deference after it applied the traditional test in

custody disputes between two biological parents—determining the best interests of the child by a preponderance of the evidence. *See Charles v. Stehlik*, 560 Pa. 334, 744 A.2d 1255, 1258 (2000) (in custody disputes, fundamental issue is child's best interest; burden of proof shared equally in custody dispute between two biological parents).

Justice BAER, dissents.

Because I agree with the Superior Court that the facts of record in this case furnish a showing adequate under the law to support the narrow restrictions attached to Stanley Shepp's (Father's) otherwise unrestricted partial custody of Kaylynne (Child), I would affirm the Superior Court's order upholding those restrictions. Accordingly, I respectfully dissent.

Tracey Roberts (Mother) and Father converted to Mormonism before their June 1992 marriage. Child was born February of 1993, and was seven years old when the parties separated in April of 2000. Mother testified that the reason for the separation was Father's conversion to what is commonly referred to as fundamentalist Mormonism, which differs from traditional Mormonism principally in its tenet that the Church of Jesus Christ of Latter-day Saints improperly strayed from the teachings of its founder, Joseph Smith, when it renounced polygamy.[1] From separation, Child lived with Mother and Mother's three other daughters from previous marriages. After a February 2001 divorce, Father filed a petition seeking shared legal and physical custody of child.

On May 6, 2002, the trial court held a hearing to consider Father's petition. Father's belief in fundamentalist Mormonism, including its principal tenet of religiously mandated polygamy, was undisputed. Father testified that he had not set a limit on the number of wives he would like, and that his new and current wife supported him in his faith. Further, Father acknowledged that he had told Child of the possibility that she

---

1. The Church of Jesus Christ of Latter-day Saints, consistently with its repudiation of polygamy and rejection of fundamentalist Mormonism as a legitimate religion, excommunicated Father for his embrace of polygamy shortly before the parties' February 2001 divorce.

would have additional mothers. Father testified that he wishes to teach Child about polygamy because, as he sees things, her happiness depends on having choices in life and it is a father's responsibility to teach children alternatives.

Mother testified that the reason for the separation was Father's belief in polygamy, and that he had indicated his desire to take five wives. Mother expressed concern that Father would introduce Child to polygamy at her then current age of nine years so that she would be ready to marry into a polygamist relationship at age fourteen. Accordingly, Mother sought an order prohibiting Father from teaching polygamy.

Importantly, Manda Lee (Manda), one of Mother's daughters from a previous marriage and Child's half-sister, testified that when she was fourteen Father told her that if she failed to practice polygamy she would go to hell. He suggested that because he and Manda were already living under the same roof, it only made sense for them to marry. While Father denied that he had suggested marriage to Manda, he did not deny her other factual averments.

The trial court found Manda's version of what occurred credible.[2] Acknowledging an important distinction between Father's right to express opinions regarding illegal and immoral activities, see 18 Pa.C.S. § 430 (criminalizing polygamy), and his willingness to commit, and coerce Child to commit, such activities, the court specifically found that Father's *conduct vis-à-vis* Manda indicated that Father "clearly would" seek to act and use his parental control to convince Child to act illegally and immorally. Tr. Ct. Op., 5/6/02, at 5. With this glaring exception, the trial court found father to be an appropriate parent to Child. Accordingly, it fashioned an order granting Father partial custody subject to the sole restriction that "Father is specifically prohibited while the child is a minor from teaching her about polygamy, plural marriages, or multiple wives." Notes of Testimony, 5/6/02, at 181.[3]

**2.** As I must, I defer to the trial court on all credibility determinations. See *Robinson v. Robinson*, 538 Pa. 52, 645 A.2d 836, 838 (1994).

**3.** The Majority's account of the case, *see, e.g.,* Maj. op. at 694–95 n. 3, 906 A.2d at 1167 n. 3, is not without basis in the record, but Father's

The Superior Court accepted the trial court's factual findings, as the law requires. Further, the court agreed with the trial court's interpretation of Pennsylvania law as permitting substantial curtailment of contact by a parent with his child only when such contact presents a grave threat of harm to Child, *see, e.g., In re Damon B.*, 314 Pa.Super. 391, 460 A.2d 1196 (1983); *Com. ex rel. Lotz v. Lotz*, 188 Pa.Super. 241, 146 A.2d 362 (1958); *cf. Zummo v. Zummo*, 394 Pa.Super. 30, 574 A.2d 1130, 1157 (1990) (opinion announcing the judgment of the court) (requiring, in support of restrictions of a parent's right to instruct his child in his religious faith, a demonstration that the "belief or practice ... to be restricted actually presents a substantial threat of present or future physical or emotional harm to the [child], and that the restriction is the least intrusive means adequate to prevent the specified harm"), an interpretation I find flawed for reasons I explain, *infra*.[4] The Superior Court read the trial court's opinion as ruling that, notwithstanding its supported factual findings, Father's conduct in espousing and urging Child toward a polygamist lifestyle presented no grave threat of harm to Child. *Shepp v. Shepp*, 821 A.2d 635, 638 (Pa.Super.2003); *see* Tr. Ct. Op., 5/6/02, at 6. The Superior Court disagreed, however, that this conclusion was supported by the facts of

testimony and the trial court's findings of fact *based* upon Father's testimony are to be distinguished. Notably, the trial court's general inclination toward crediting testimony that contradicted Father's is evident in its opinion as well as in the order it ultimately issued, which speaks volumes regarding the trial court's in-person assessment of Father's intentions. The Majority relies upon the trial court's statement that "there has been no evidence of a grave threat to the child in this case." Tr. Ct. Op., 5/6/02, at 6. For this reason, it granted Father partial custody, a ruling I would not overturn. Nevertheless, its other observations emphasize the seriousness of Father's intention regarding inculcating the young women in his family, Child included, into a polygamist lifestyle. In sum, I believe the trial court's opinion indicates that it found a sufficiently grave threat to warrant restricting Father's ability to indoctrinate Child into criminal conduct; that it ordered the restriction in the first place, after articulating the "grave threat of harm" standard, implies as much. In addition, this reading honors the trial court's broad discretion to act in Child's best interests.

4. In *Zummo*, the non-precedential opinion announcing the judgment of the court was authored by Judge Kelly, and Judge Rowley concurred in the result. Judge Johnson authored a dissenting opinion.

record. Rather, it found that Father's discussions with then-fourteen-year-old Manda constituted "a vigorous attempt at moral suasion and recruitment by threats of future punishment [*i.e.* going to hell]," *Shepp*, 821 A.2d at 638, tantamount to the sort of threat it ruled necessary to support the entry of restrictions on conduct in the context of a custody case. It noted as well that Father's intent to "inculcate in his child a belief" in polygamy did not materially diverge from his intent toward Manda. *Id.*

The Majority Opinion treats this case as presenting fundamental challenges to Father's expressive rights under the First Amendment to the United States Constitution and to his fundamental right, coequal to Mother's, to direct the education and upbringing of Child. It is imperative, however, to distinguish matters of free expression from matters of immoral and criminal conduct. Where the former amounts to indoctrination into the latter, constitutional rights begin to yield to society's interests in regulating such conduct. *Compare Davis v. Beason*, 133 U.S. 333, 344, 10 S.Ct. 299, 33 L.Ed. 637 (1890) ("[W]hile [laws] cannot interfere with mere religious belief and opinions, they may with practices.") *with Romer v. Evans*, 517 U.S. 620, 649, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (noting that *Davis* has been overruled "to the extent, if any, that it permits the imposition of adverse consequences upon mere abstract advocacy of polygamy"). The state also has an unquestionable *parens patriae* obligation to protect its children and serve their best interests.

Accordingly, the First Amendment permits a parent to espouse to his or her child principles consistent with his or her values. Thus, a parent may discuss conduct seen by society as immoral or criminal; nothing in the law prevents a parent from extolling the abstract virtues of conduct widely perceived as odious, such as racial bias, drug use, underage drinking, or the like, so long as the discussion does not amount to an active attempt to urge the child into that conduct.[5] However, where

---

5. *But see Shepp*, 821 A.2d at 638 ("The question whether we would find ... benign advocacy of drug abuse or child prostitution were they presented as foundational religious beliefs is no question at all.").

speech of this sort crosses the line that separates it from conduct, a threshold not unlike that between the more ordinary phenomenon of discussing a crime ("I wish you would kill my boss") and taking a substantial step in that direction ("Here's a gun and $20,000; kill my boss."), constitutional protections pertaining to expression without a coercive element fall away and the state may intervene.

In the case at hand, relying on Manda's testimony and Father's statements toward Child, the trial court found, as a matter of fact—and in isolation from its restatement of what it took to be the governing standard—that Father had crossed the line between expression and conduct, finding that Father had every intention of "follow[ing] through" on his beliefs and, unchecked, would do whatever he could, in his position of considerable authority as Child's parent, to lead Child into a life of polygamy while still of tender years. In light of this factual finding, one entirely supported by the evidence of record, the trial court's remedy granting father partial custody and restricting him only from teaching his daughter about polygamy is not only constitutionally tolerable, but indeed laudably restrained. The trial court's order was narrowly tailored to hedge against Father's coercive conduct in seeking to induct Child into a repugnant and criminal activity in adolescence at a time when Child's lack of autonomy and worldly sophistication would make it difficult for her to protect herself and make an informed decision. On this basis alone, I would rule that the trial court's order was constitutionally permissible and appropriate to protect Child in light of the facts of record.

Moreover, even assuming *arguendo* that the trial court's order infringes Father's free expression or intrudes upon his fundamental right as a parent to direct the education and upbringing of Child, thus incurring constitutional protection, I would still find the trial court's order constitutional. The trial court, the Superior Court, and now a majority of this Court, adopted and applied the rule that only a "grave threat of harm" may justify such an intrusion, relying upon the United States Supreme Court's decision in *Wisconsin v. Yoder*, 406

U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). This is only half of the *Yoder* test. *Yoder* provided that "parental authority in matters of religious upbringing may be encroached upon only upon a showing of a 'substantial threat' of 'physical or mental harm to the child, *or to the public safety, peace, order, or welfare.*'" *Id.* at 230, 92 S.Ct. 1526 (emphasis added).

Although the one-judge opinion announcing the judgment of the Superior Court in *Zummo,* 574 A.2d at 1138–39, quoted the full *Yoder* test as set forth above, it then abandoned further discussion of the second half of the test because it was not pertinent to the facts of that case. Unfortunately, *Zummo* restated the incomplete *Yoder* test numerous times, reinforcing its silence regarding the test's second component. Thus, *Zummo* appears to limit when the state can infringe on a parent's constitutional right to circumstances presenting "a substantial risk of harm to the child in [the] absence of intervention," *id.* at 1140, *see also id.* at 1141; a "substantial threat of physical or mental harm to the child," *id.* at 1141 (internal quotation marks omitted); "a substantial threat of harm to the child arising from [differences between competing faiths] in [the] absence of the proposed restrictions," *id.* at 1154; and "a substantial threat of present or future, physical or emotional harm to the child," *id.* at 1155. *Zummo* culminated in the following language:

> We hold that in order to justify restrictions upon parent[s'] rights to inculcate religious beliefs in their children, the party seeking the restriction *must demonstrate, by competent evidence that the belief or practice of the party to be restricted actually presents a substantial threat of present or future physical or emotional harm* to the particular child or children involved in absence of the proposed restriction, and that the restriction is the least intrusive means adequate to prevent the specified harm.

*Id.* at 1157 (emphasis added).[6] Gone was any mention of the second prong of *Yoder's* disjunctive test—the question of

---

6. As noted previously, *see supra* n. 3, the "we" language is misleading, as the lead opinion in *Zummo* failure to garner an outright joinder from either of the other judges on the panel depriving *Zummo* of precedential

whether permitting inculcation in a particular religious practice presents a "substantial threat ... to the public safety, peace, order, or welfare." [7]

In *Yoder*, by contrast, the Court found that the restrictions imposed upon the involved parents intruded upon their free exercise of religion, freedom of expression, and the fundamental right to direct the upbringing of their children, and thus were subject to constitutional protection—the point I assume in this case only *arguendo*. The Court noted that parental decisions are entitled to no peculiar respect if they "will jeopardize the health or safety of the child, *or have a potential for significant social burdens.*" *Id.* at 233–34, 92 S.Ct. 1526 (emphasis added); *see also Bykofsky v. Borough of Middletown,* 401 F.Supp. 1242, 1262 (M.D.Pa.1975) ("[T]he right of the parent to direct the upbringing of his children and the right to family autonomy are not absolute. When actions concerning the child have a relation to the public welfare or the well-being of the child, the state may act to promote these legitimate interests.").

The first part of this limitation, concerning the health or safety of the child, suggests the "grave" or "substantial threat of harm" standard focused upon by the Majority and the courts below; [8] the latter aspect, concerning the "potential for

effect. I discuss it here only because it accurately encapsulates the Superior Court's reasoning in other cases *sub silentio* neglecting the second half of the *Yoder* test, as does the Majority here. *See, e.g., Damon B.,* 314 Pa.Super. 391, 460 A.2d 1196; *Lotz,* 188 Pa.Super. 241, 146 A.2d 362.

7. As mentioned above, the *Zummo* opinion addressed circumstances unlike those in the instant case, which presented little cause for the court to consider the second part of the *Yoder* Court's analysis. In *Zummo*, the question concerned whether a divorced father could be compelled to deliver the children to synagogue for religious instruction consonant with mother's Jewish faith, and similarly compelled not to bring the children to mass and celebrations of a Catholic character. In no sense did that case present any suggestion that either Judaism or Catholicism, in the conventional forms of those traditions there at issue, might constitute a threat to public welfare and safety.

8. I do not read a "grave threat of harm" to be equivalent to "a substantial threat of harm to the physical or mental health" of the child in question, since one readily can imagine a "substantial threat" to a child's physical or mental health, one that courts should be free to

significant social burdens," suggests a broader inquiry assessing whether exercise of those prerogatives will conflict with the state's legitimate interests in preserving public welfare and mitigating significant social burdens. The Superior Court, as well as the Majority, have failed to address this distinct inquiry in the context of this case,[9] which I believe is squarely presented and requires us to uphold the trial court's custody order narrowly limiting Father's right to inculcate Child into a practice long-since deemed immoral and criminal in every jurisdiction of the United States—not only because it presents a "grave threat of harm" to the child, but also because the practice of polygamy long has been identified as a "substantial threat" to public welfare, an unsustainable burden on society, and a crime. *See* Maj. op. at 699–700, 906 A.2d at 1170 (enumerating cases upholding the criminalization of polygamy).

We would in no way depart from settled caselaw, at the state or federal level, or act contrarily to Pennsylvania law, to identify the coercion by a parent of his child into the criminal practice of plural marriage as presenting "a potential for significant social burdens" sufficient to invoke the second aspect of the *Yoder* test. Indeed, that plural marriage has been criminalized in Pennsylvania and virtually everywhere else demonstrates an overwhelming consensus of moral opprobrium regarding the practice and refuting the notion that the burden on society of the practice can legitimately be claimed to be ephemeral or inchoate. Indeed, this Court specifically

remedy in serving that child's best interests, that nevertheless does not constitute a "grave threat" of harm under the plain meanings of the relevant terms. I need not delve deeper into the distinction, however, since I find the public welfare aspect of *Yoder* controlling to the extent that Father's coercive conduct is entitled to any constitutional protection at all.

9. The Majority, like the opinion announcing the judgment of the Superior Court in *Zummo*, properly quotes the *Yoder* test but then focuses solely on the first half of that test concerning the threat to the health or safety of the child. *Compare* Maj. op. at 704, 906 A.2d at 1173 (noting that *Yoder* permits restrictions "if it appears that parental decisions will jeopardize the health or safety of the child, *or have a potential for significant social burdens*" (emphasis added)), 704, 906 A.2d at 1173 (same) *with id.* at 13 ("[T]he focus of our review [under *Yoder* is]

has observed that polygamy presents "a substantial threat to society," *see In re Green,* 448 Pa. 338, 292 A.2d 387, 389 (1972), echoing the language of *Yoder.*

Thus, I would adopt as part of Pennsylvania law the second half of the *Yoder* test recognizing government's need to protect society as a whole, and uphold the trial court's decision as affirmed by the Superior Court under either the first half of the *Yoder* test, which is already part of our law, or under the second half of *Yoder,* constraining individual action inimical to society as a whole.

whether the nature of the conduct and/or speech establishes *that it will not harm the child."* (emphasis added)).