J-A25003-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| J.M. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| R.M.M. | : | No. 458 WDA 2021 |

Appeal from the Order Entered March 22, 2021,
in the Court of Common Pleas of Allegheny County,
Family Court at No(s):  FD 16-004092-008.

BEFORE:   KUNSELMAN, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.:                 **FILED: FEBRUARY 24, 2022**

Appellant J.M. (Father) appeals the order of the Allegheny County Court of Common Pleas, which awarded R.M.M. (Mother) primary physical custody and sole legal custody of their three Children: 11-year-old daughter N.M.; and 8-year-old twins, daughter E.M. and son B.M.  The trial court reduced Father's physical custody after determining the Children needed more structure during the school year.  Mother's sole legal custody award is limited to narrow decision-making powers regarding the Children's mental health, after the court found that Father's refusal to acknowledge N.M.'s needs had caused her to be without necessary treatment.  On appeal, Father challenges these substantive custody awards on multiple grounds: that the court's decision was based on improper gender preferences; that the decision was predicated upon

_____

[*] Retired Senior Judge assigned to the Superior Court.

improper judicial notice; and that the court infringed on Father's First Amendment right to free exercise. After careful review, we affirm.

The record discloses the following relevant factual and procedural history. The parties initially lived in Washington state prior to moving to Pittsburgh, Pennsylvania in 2011. The parties separated in 2016, and the marital home was sold. Mother and the Children moved to a new home in the same school district, while Father moved to a neighboring suburb. That same year, the parties entered into a custody consent order, which provided Father with shared legal custody and substantial partial physical custody – approximately 6 out of every 14 overnights.

However, litigation became frequent and increasingly acrimonious. In May 2018, the court issued an order forbidding Father from speaking with the Children about potential changes in the custody schedule. In November 2019, Father filed for shared custody, and Mother counterclaimed for primary custody and sole legal custody. In January 2021, Mother filed for contempt of the May 2018 order, and the contempt hearing was consolidated with the instant custody trial.[1]

The trial court's consolidated hearing spanned three dates: February 8, February 9, and February 24, 2021. A major focus of the custody dispute was the Children's mental health, and the parents' abilities to respond to the same. The court heard from both parties, personnel from the Children's school

_____

[1] The court ultimately held Father in contempt of the May 2018 order. Father's appeal of that order is separately listed before this panel.

district, as well as Dr. Jan Marlan, who conducted psychological evaluations. Dr. Marlan recommended the court award shared physical and legal custody, cautioning that a sole legal custody award would only increase the conflict between the parties. The court disagreed. After extensive testimony, the court determined *inter alia* that Mother was more likely to attend to the Children's mental health needs, and that the parties' inability to communicate and reach consensuses demonstrated the need for a sole decisionmaker – *i.e.*, a sole legal custodian. *See* Order of Court, 3/22/21. The court awarded sole legal custody for this limited purpose. In all other aspects, the parties shared legal custody.

The court also determined the Children needed more focus and stability during the school week, and it reduced Father's partial physical custody. Instead of Father exercising 6 out of 14 overnights, Father's schedule was reduced to alternating weekends with a weekly Thursday overnight. However, the court awarded shared custody during the summer, on a week-on-week-off basis. *Id.*

The court also denied the parties' respective claims for sole legal custody regarding the Children's religious upbringing. In this respect, the trial court allowed the parents to direct the Children's religious upbringing as they saw fit during their respective custody time; however, the order provided that Father "must continue to cooperate with the Children's participation in the Jewish Faith[.]" *Id.* at ¶1.9(a).

Father filed this timely appeal. He presents six issues for our review, which we re-order for ease of disposition:

1. Whether the trial court erred and/or abused its discretion by making a custody determination where a party received preference based upon gender in violation of 23 Pa.C.S.A. § 5328(b)?

2. Whether the trial court erred and/or abused its discretion by making a custody determination that is not supported by the record and/or is based upon inappropriate judicial notice?

3. Whether the trial court committed an error of law and/or abused its discretion by making a custody determination that relies at least in part on inappropriate judicial notice and/or information outside the record with regard to Attention Deficit Disorder / Attention Deficit Disorder with Hyperactivity?

4. Whether the trial court erred and/or abused its discretion by entering an order that awarded Mother sole legal custody regarding the psychiatric treatment contrary to the best interest of the Children as set forth in 23 Pa.C.S.A. § 5328(a)?

5. Whether the trial court erred and/or abused its discretion by entering an order that reduced Father's physical custody contrary to the best interest of the Children as set forth in 23 Pa.C.S.A. § 5328(a)?

6. Whether the trial court committed an error of law and/or abused its discretion by failing to explicitly rule on the request for legal custody regarding the religion of the children and/or restricting Father's ability to freely exercise his religion in violation of the First Amendment of the United States?

Father's Brief at 21-22 (capitalization adjusted).[2]

_____

[2] Father included a seventh issue in his concise statement of matters complained of on appeal, but he has chosen to forgo that issue on appeal.

We begin our analysis by acknowledging the pertinent scope and standard of review:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*S.T. v. R.W.*, 192 A.3d 1155, 1160 (Pa. Super. 2018) (citation omitted).

Insofar as Father presents a question of law, however, we note that our scope and standard of review changes. As with all questions of law, the appellate standard of review is *de novo* and the appellate scope of review is plenary. *E.C.S. v. M.C.S.*, 256 A.3d 449, 454 (Pa. Super 2021) (citations omitted).

On multiple occasions, both the Supreme Court of Pennsylvania and the Supreme Court of the United States have acknowledged that parents enjoy a fundamental constitutional right to raise their children as they deem fit. *See, e.g., Interest of S.K.L.R.*, 256 A.3d 1108, 1126 (Pa. 2021); *see also D.P. v. G.J.P.*, 146 A.3d 204 (Pa. 2016); *and see Troxel v. Granville*, 530 U.S. 57 (2000) (recognizing the existence of a constitutionally protected right of

parents to make decisions concerning the care, custody, and control of their children) (citing U.S.C.A. Const. Amend. 14).

In Pennsylvania, custody disputes are governed by the Child Custody Act, 23 Pa.C.S.A. §§ 5321-5340. In ordering any form of custody, the court shall determine the best interest of the child by considering the sixteen enumerated factors set forth in Section 5328(a). When – as was the case here – a party seeks to modify the **type** of custody award, the court must still conduct a Section 5328(a) analysis. **See A.V. v. S.T.**, 87 A.3d 818, 824 n.4 (Pa. Super. 2014) (emphasis added); **see also** 23 Pa.C.S.A. § 5338 ("Modification of existing order."); **and see** 23 Pa.C.S.A. § 5323(a) ("Award of custody."); **cf. M.O. v. J.T.R.**, 85 A.3d 1058, 1063 (Pa. Super. 2014) (holding that a comprehensive Section 5328(a) analysis is not always necessary when a party merely seeks modification of "a discrete custody-related issue.").

It is generally "within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case." **M.J.M. v. M.L.G.**, 63 A.3d 331, 339 (Pa. Super. 2013). However, we note that Section 5328(a) obligates the court to give weighted consideration to those factors affecting the safety of the child. Moreover, Section 5328(b) provides: "In making a determination under [the custody factor analysis], no party shall receive preference based upon gender in any award granted under this chapter." 23 Pa.C.S.A. § 5328(b). After reaching a decision, the trial court must delineate its reasons for the award on the record in open court, or

in a written opinion or order near the time of the decision to allow a party to take an effective appeal. **See** 23 Pa.C.S.A. § 5323(d); **see also M.O.**, 85 A.3d at 1064 n.5 (citations omitted).

With these principles in mind, we turn to Father's first appellate issue. Father alleges the trial court violated the Child Custody Act's prohibition on gender preferences, because its decision was predicated upon the belief that women are better suited to respond to a child's mental health. **See** Father's Brief at 27. To explain, the court awarded Mother sole legal custody after it concluded that Father was not adequately responding to the Children's needs – specifically, N.M.'s need to be treated for Attention Deficit Hyperactivity Disorder (ADHD). The court reasoned in its Pa.R.A.P. 1925(a) opinion:

> I found the majority of the problems moving forward with treatment for N.M. originated with Father, and his inability or refusal to face the facts about his daughter's condition. Accordingly, since only one party could have legal custody over this discrete issue, I chose the parent who was more willing to listen to professionals and follow their advice.

Trial Court Opinion (T.C.O.), 6/2/21, at 11

Father claims the court's findings were based on gender preferences. To support his argument, Father cites four separate excerpts from the hearing transcript, during which the court spoke in generalities about men and fathers, and the fear of stigmas involving mental health treatment. **See generally** Father's Brief at 27-31.

The first excerpt comes from the direct examination of Dr. Marlan, who conducted the psychological custody evaluation. The court asked the witness why Father resisted the idea of having N.M. seen by a child psychiatrist.

Dr. Marlan: I think he's worried about seeing his daughter seen as having – as crazy.

The court: I had the conversation with [Father] also regarding the fact that in 15 years of doing this I've never had a woman take that position with this issue, never. ***It's always a man, it's always the dad.*** I actually consulted psychiatrists about this phenomena and it just isn't true. I had that conversation, and in spite of that it still did not occur, still has not occurred.

Dr. Marlan: What do you mean? What hasn't occurred?

The court: [N.M.] has not seen a psychiatrist.

Dr. Marlan: Oh, I see.

The court: Some people think it is less important than others, but she has significant difficulties with friends.

Dr. Marlan: I hope somebody would ask him exactly why he wants her medicated by a pediatrician versus – not medicated by, but the pediatrician to handle the medication.

The court: I think it is a negative answer. He doesn't want her to go to a psychiatrist. In any event, the child is now eleven. It is over two years. She's now into puberty and has been suffering with these problems untreated for years and years.

Dr. Marlan: Well, I do understand that some parents have objections to medicating their kids.

The court:      So do I.

Dr. Marlan:     I have seen that many times. You know, there is a position on that that's worth looking at, but in this particular case it seems so clear to know that it would help this kid, and she has to be on the right medication at the right level, and the one best able to do that is the child psychiatrist. And if it is [Father], [Father], let your kid see a child psychiatrist.

The court:      Well, we had that conversation three years ago. That is why I'm concerned about your recommendation of shared legal [custody]. [The parents] have been fired by five psychiatrists who refused to treat the child because [the parents] couldn't agree.

N.T., 2/8/21 (Day 1), 45-47 (emphasis added).

Later in the trial, the court again spoke in generalities about gender. Father's parenting abilities had been questioned after Mother submitted pictures of the Children's unkempt hair:

Father:         I'm doing the best I can under the circumstances.

The court:      Would you agree that your best is not doing a good job right now?

Father:         I'm hoping things will get better when this trial is over, because I think a lot of things have been in preparation for this trial.

The court:      Well, I would agree with your that - - let me ask you this question. Did mom and you ever have a conversation, like an e-mail – you don't talk on the phone – like an e-mail regarding the children's hair?

Father:          I don't think she ever told me about it.

The court:      I would agree with you certain things like that mom may have been (indicating), taking pictures of her hair so she could slam dunk it with you at trial. I agree with you on that. Maybe she will change my mind on direct [examination]. I found that not to be in the best interest of the children and kind of horrifying and humiliating. I would have come to you – I would have found a way to build, earn, and maintain enough trust in you in order to protect my child from a guy's rendition of what's okay with girls. ***I know that you didn't know that because you were never a teenage girl. I know that because I was a teenage girl. I also know that sometimes I have to tell men that they don't know things that ladies know.*** That is partly because [you] haven't built, earned, maintained any trust with her, or vice versa.

N.T. 2/9/21 ("Day 2"), 469-70 (emphasis added).

As Father's case-in-chief wound down, the trial court provided its preliminary assessment. In a self-described "speech," the court explained how the level of conflict between the parents – and their desire to be right, or to win an argument – was detrimental to the Children. The court offered an example of conflict avoidance from the trial judge's own life, a time when she needlessly took issue with how one is supposed to put dirty dishes in the sink. The moral of the story was how partners must often decide whether to be happy or whether to be right; that perhaps it is more important to be "fun to live with," than to be the winner of petty arguments. ***Id.*** at 471-72. The

- 10 -

J-A25003-21

court then circled back to the hair issue and Father's alleged resistance to

N.M.'s ADHD diagnosis:

> The court: The fact you didn't know about the hair ***is a typical guy kind of thing.*** What is worse is the fact that [Mother] didn't talk to you about it is a horrible thing. It is horrible. I don't know why it didn't happen. I hope she addresses it [during her case-in-chief].
>
> If you were a babysitter, I wouldn't have allowed you to let my daughter's hair go like that. But [Mother] is like, you did that and took pictures. I'm sure she will talk to me about why she didn't talk to you about it. Maybe she did talk to you about it. I don't know.
>
> I'm trying to explain to you what is so much wronger with this case than my other cases. It's not the facts. It's not the ADHD. Half of my cases have ADHD. ***Almost 75 percent of those cases have a dad who refuses to admit that their child has anything wrong with them, or thinks that they are trying to label the child, and then I have to go through this whole nonsense and take legal custody away and all this stuff.***
>
> ***Never once have I had a female, a mom, refuse to go to a psychologist or medicate a child, not once in 15 years.*** So think about that, how much fun are you to live with? As long as you're no fun to live with, you're going to lose with your kids because you're not going to be able to make any progress.
>
> All right, re-cross [examination].

N.T. (Day 2), at 475-76. (emphasis added).

- 11 -

Finally, Father cites the portion of the transcript when the trial court delineated its findings in open court, pursuant to Section 5323(d). The court addressed Factors 9 and 10 together. Section 5328(a)(9) inquires: "Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs." 23 Pa.C.S.A. § 5328(a)(9). Section 5328(a)(10) inquires: "Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child." 23 Pa.C.S.A. § 5328(a)(10).

The court began the delineation of its findings under these Subsections by opining that Father's parenting style was wrong for these Children:

> The court: [Father's] not wrong because he doesn't love the Children. I believe he does love the Children. But he's wrong because he has a narrative that he is running around inside of that doesn't even look at the facts. One of the evidences of that is refusing to have [N.M.] tested for an IEP [(Individualized Education Program)], like that would be a harm for her. **And that's typical of men in my cases.**
>
> **In all of the cases I've had, I've never had a woman say that their child should not have an IEP or does not have ADD. Maybe it's a social thing, that men are raised to believe certain things, I don't know.**

*See* N.T., 3/12/21 ("Findings of Fact."), at 15 (emphasis added).

- 12 -

The court ultimately found that Factors 9 and 10 favored Mother, because she was the parent more likely to follow the advice of medical and mental health professionals. *Id.* at 16.

On appeal, Father claims these passages evince the court's gender preference, in direct violation of Section 5328(b). For support, Father cites our Supreme Court's decision in ***Com. ex rel Spriggs v. Carson***, 368 A.2d 635 (Pa. 1977), which questioned the legitimacy of the "tender years doctrine"[3] as being predicated upon the traditional or stereotypic roles of men and women in a marital union. Father also cites the United States Supreme Court's momentous decision in ***Weinberger v. Wisenfeld***, 420 U.S. 636, 652 (1975), which noted that "a father, no less than a mother, has a constitutionally protected right to the companionship, care, custody, and management of the children he has sired and raised, which undeniably warrants deference and, absent a powerful countervailing interest, protection." (Internal quotations and citation omitted).

In response, Mother argues the trial court's comments were *obiter dictum* – that is, they were merely passing remarks. ***See*** Mother's Brief at 9. Alternatively, Mother argues that the court's error was harmless. ***Id.*** Father replied that the court's comments could not be construed as *obiter dictum*, as they spoke directly to the custody matter at issue, nor could the error be construed as harmless. ***See*** Father's Reply Brief at 7-9.

_____

[3] The tender years doctrine was the now-disfavored theory that children should reside with their mother – or "the residential parent" (read: the stay-at-home mother).

In its Rule 1925(a) opinion the court explained what it meant by its statements:

> In this particular case, Father was intractable for over two years in his refusal to medicate his daughter for her ADHD. Father first would not consent to the professionals who recommended that she be evaluated for ADHD, then he would not accept the diagnoses, and later, once he belatedly accepted the diagnoses, he would not consent to the medication repeatedly recommended. I pointed out that to Father that, in my years of experience on the bench, it tends to be fathers who refuse or are unable to acknowledge that their children require medication for a psychological condition, whereas mothers are willing to accept the recommendations of professionals and teachers.
>
> ***Though that has been my actual experience, that experience is not what I depended on in reaching my decision in this case***. I mentioned this experience during trial merely as an attempt to educate Father that he was, despite his training and education, not unique. I hoped to, perhaps, get him to examine his motivations and realize that his reluctance to medicate his daughter was misguided, was not in her best interests and had, in fact, caused a delay in treatment which was harmful to her.
>
> My references to the behavior of other fathers who have appeared before me did not demonstrate any actual gender bias. Nor did I base my award of custody on a preference for Mother because of her gender. I preferred Mother as a primary custodian and sole legal custodian in some areas because her actions demonstrated that she put the needs of her Children first and, moreover, she is willing to follow the recommendation of the professionals with regard to the treatment of her Children.

T.C.O. at 12-13 (emphasis added).

After review, we conclude that the court's remarks do not evince a gender preference under Section 5328(b). Perhaps the trial court's aspersions, though cast in the context of the court's previous cases, did more

harm than good. But these remarks alone do not merit reversal. As we have explained:

> The appearance of bias or prejudice can be as damaging to public confidence in the administration of justice as the actual presence of bias or prejudice. However, simply because a judge rules against a party does not establish bias on the part of the judge against that party. Along the same lines, a judge's remark made during a hearing in exasperation at a party may be characterized as intemperate, but that remark alone does not establish bias or partiality.

*Lewis v. Lewis*, 234 A.3d 706, 722 (Pa. Super. 2020) (quoting *Commonwealth v. McCauley*, 199 A.3d 947, 950-51 (Pa. Super. 2018) (further citation omitted)). *See also Interest of D.J.B.*, 230 A.3d 379, 386 (Pa. Super. 2020) (holding that a judge's remark contextualizing the juvenile's delinquent act within the Me Too Movement did not establish bias or partiality).

The question we must decide is simply whether the trial court abused its discretion in awarding custody to Mother. In practice, discretion is abused when the course pursued represents not merely an error of judgment, but where the record shows that the action is a result of partiality, prejudice, bias or ill-will. *Lewis*, 199 A.3d at 722 (citations omitted). At most, the trial court's commentary could be viewed as an error of judgment. But even then, neither an error of judgment nor a remark made in exasperation constitutes an abuse of discretion when the record supports the court's decision.

Here, the court heard testimony that N.M. was in need of treatment, that N.M. had gone without treatment because Father refused to give his

consent, and that Father's resistance to N.M.'s treatment was due to his concern that the Child would be viewed as "crazy." In other words, the court's remarks did not come out of the ether. Moreover, the court stated that it shared parents' hesitancy to medicate their children. Although the court mentioned to Father that he would not be the first man to voice skepticism about their children's special needs, the court's ultimate decision was not the result of a gender preference. Rather, the award was properly based on the application of the Section 5328(a) factor analysis, and the court's individual factor determinations were, in turn, supported by competent evidence and legitimate credibility findings. Father's first issue is without merit.

We turn next to Father's second and third issues, which Father addresses together. **See** Father's Brief at 51-52. These issues also concern remarks the court made during its on-the-record delineation of Factors 9 and 10, **supra**. Specifically, Father alleges that the court erred by taking judicial notice of certain facts relating to ADHD, and then basing its custody decision on the same.

During the delineation of the custody factors, the court determined that Father's inability to acknowledge N.M.'s special needs had caused her to go untreated for her ADHD. Although the court did not find Mother blameless, it determined that she was best suited to meet the Child's needs because she was more inclined to follow professional advice. In addressing Father's inability to tend to the Children's needs, the court provided Father with an example – namely, his resistance to having N.M. evaluated for an IEP. The

court disapproved of Father's resistance to the IEP evaluation, specifically because he pushed for N.M. to be evaluated for above-average intelligence – *i.e.*, "gifted." The inference being, Father did not oppose an evaluation of N.M., so long as the evaluation was for something with a positive connotation. In that sense, the court likened Father's preoccupation with the stigma associated with an IEP with his preoccupation with the stigma associated with psychiatric treatment. It was during this explanation that the court stated it was taking judicial notice.

> The court: But it [(Father's resistance to getting the Child evaluated for an IEP)] clearly didn't help the child and she's still - - we're just not getting her help. We still do not have her with a psychiatrist. And she had pretty severe evidence of ADHD, but Dad, while he was insisting - - he refused to do that, and he wanted a gifted test.
>
> ***And I can take judicial notice and personal notice, I have a gifted child and a non-gifted child, you can tell. It's really easy to tell***. Other people don't tell you that. You know. And it's very evident. And of course, the child does not evidence any gifted abilities. That doesn't mean she's stupid. She's very bright. Of course, she's bright. But now we know she's not gifted.
>
> Why do you [(Father)] even want – she wasn't anywhere near the gifted cut off. I wouldn't have had a problem with asking to have her referred to as gifted. I did have a problem with her not – with not saying she didn't have ADHD just based [on] things people had told you.

N.T. (Findings of Fact) at 15-16 (emphasis added).

On appeal, Father argues the court abused its discretion by taking judicial notice of information outside of the record. *See* Father's Brief at 52. Father contends that the court projected its own beliefs about the best interests of a child with ADHD, instead of properly relying on the expert testimony of Dr. Marlan. *Id.* Father reasons that the record does not support the trial court's finding that Father denied treatment for N.M.'s ADHD. He concludes that the trial court's "imposition of judicial notice upon the parties played a significant part in the overall determination, as it resulted in an award of sole legal custody to Mother for all of the children's psychiatric treatment and a reduction of Father's custody time." *Id.* at 54.

Initially, we question the accuracy of Father's depiction of what the court judicially noticed. As far as we can tell from the record, the court's statement about judicial notice referred to one's ability to tell a gifted child from a non-gifted child. The offending statements did not pertain to ADHD, at least not directly. The court explained that it did not have a problem with Father thinking N.M. was "gifted" when she was not, but that his refusal to acknowledge N.M's special needs had caused the child to go without necessary treatment.

In response, Mother makes this exact argument. *See* Mother's Brief at 48. Mother reasons that the difference between a gifted and non-gifted child was not a fact the court was deciding in this case, nor was it at issue. Mother contends that none of the court's custody determinations was based on that statement, and thus Father was not prejudiced. Mother concludes that the

statement was *dicta*, or in the alternative, the statement was harmless error.

***Id.***

We are inclined to agree with Mother's position. Curiously, however, the court specifically admitted in its Rule 1925(a) opinion that it took judicial notice of the symptoms and treatment of ADHD. The court stated, in relevant part:

> ***I did take judicial notice of the symptoms and treatment for ADHD, which is not inappropriate as these are, in fact, common knowledge.*** […] Father takes issue, apparently, with comments I made regarding my personal experiences with the condition as well as my familiarity with literature on the subject. Father ignores the fact that a reading of my order in this matter demonstrates that ***my previous knowledge regarding ADHD did not impact my deliberation or weighing of the custody factors***.
>
> To the contrary, my decisions were based squarely on the often-inappropriate behavior of the parties, particularly Father, as they were faced with addressing N.M.'s ADHD and the impact that behavior has had on N.M. and their other Children. I found that Father's neglectfulness, his intractability, his inconsistence, and his deceitfulness made it appropriate for Mother, who has her own less harmful shortcomings, to have more custody time in the school year as well as sole legal custody concerning psychiatric care.

T.C.O. at 13 (capitalization adjusted) (emphasis added).

The Pennsylvania Rules of Evidence provide the types of facts a court may take judicial notice: "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

- 19 -

Pa.R.E. 201(b)(1)-(2). "Thus, in deciding whether a trial court erred in taking judicial notice, we must determine whether the notice was of an indisputable fact, *i.e.*, one which is so commonly known that it need not be supported with evidence[.]" ***In Interest of D.S.***, 622 A.2d 954, 960 (Pa. Super. 1993).

The symptoms and treatment for ADHD are not the sort of "indisputable facts" "so commonly known" that they can be supported without evidence. Indeed, the Children's mental health and their treatment were a centerpiece of the custody trial, as well as a focus of Dr. Marlan's expert testimony. These facts were the most disputed. That the specifics of N.M.'s diagnosis and treatment were the subject of expert testimony only further demonstrates that these facts are not "commonly known," regardless of whether the trial court had personal or professional experience with the matter.

The question now becomes how to proceed in light of the court's error. The harmless error doctrine is designed to advance judicial economy by obviating the necessity for a retrial. ***Commonwealth v. Allshouse***, 36 A.3d 163, 182 (Pa. 2012). Under the harmless error doctrine, the question is whether the party claiming error suffered prejudice from the mistake. ***See J.C. v. K.C.***, 179 A.3d 1124, 1129-1130 (citing ***Harman ex rel. Harman v. Borah***, 756 A.2d 116, 1122 (Pa. 2000)).

Father argues that the court's reliance on its own understanding of ADHD played a significant part in the overall custody determination. However, the court explained it was the parents' behavior and their high degree of conflict that warranted the sole legal custody award. The court reasoned that

Mother was the more suitable custodian between the two, because she was more inclined to heed professional advice. Beyond N.M.'s need for ADHD treatment, the court determined Father's parenting style left the Children in need of structure and stability during the school year. Most importantly, the court explicitly stated that its previous knowledge of ADHD did not impact its deliberation or weighing of the custody factors. Rather, the court explained that its basis for the award was the underlying testimony and evidence regarding N.M.'s need for treatment, and Father's refusal to ensure the same. *See* T.C.O. at 12, 13. The record supports the court's decision.

Furthermore, as we noted above, the cited instance of the court's judicial notice was about one's ability to distinguish gifted children from non-gifted children. That the court mentioned this in passing demonstrates the tangential nature of the remarks. The court's comments about gifted children are not much different than its aforementioned comments about gender – imprudent perhaps, but not erroneously prejudicial. We therefore conclude that, insofar as the court improperly acknowledged it had personal experience regarding ADHD – or the ability to tell gifted children apart from non-gifted children – the court's error was harmless. Father's second and third issues merit no relief.

Having disposed of those issues ancillary to the substantive custody decision, we turn now to the crux of Father's appeal – namely, the legal and physical custody awards. We begin with Father's fourth issue. He argues the trial court erred when it awarded Mother sole legal custody to make mental

health decisions on behalf of the Children. *See* Father's Brief at 31. According to Father, the error was the court's misapplication of certain criteria which he claims must be analyzed when departing from a shared custody award. The four additional factors are:

> (1) whether both parents are fit, capable of making reasonable child rearing decisions, and willing and be able to provide love and care for their children; (2) whether both parents evidence a continuing desire for active involvement in the child's life; (3) whether the child recognizes both parents as a source of security and love; (4) whether a minimal degree of cooperation between the parents is possible.

*See Yates v. Yates*, 963 A.2d 535, 542 (Pa. Super. 2008) (quoting *Wiseman v. Wall*, 718 A.2d 844 (Pa. Super. 1998) (hereinafter "the *Yates*-*Wiseman* factors").

Immediately, we recognize that Father's argument is predicated on decisions which have been superseded by the current iteration of the Child Custody Act. *See P.J.P. v. M.M.*, 185 A.3d 413, 420 (Pa. Super. 2018); *see also S.T.*, 192 A.3d at 1170.

In *P.J.P.*, the appellant-father argued that the trial court erred when it denied his petition for shared physical custody without first considering the four *Yates-Wiseman* factors. We explained that Father's reliance on *Wiseman* (and other progeny decisions applying the same four-factor rule) was misplaced, because those cases were decided before Section 5328(a) came into effect on January 1, 2011. We held that Section 5328(a)(1)-(16)

now incorporates each of the four **Yates-Wiseman** factors. **P.J.P.**, 185 A.3d at 420.

But this was not the most critical departure from **Wiseman**. We also noted that **Wiseman**, by its terms, required the trial court "to make at least a minimal finding that the parties were able to cooperate before awarding shared custody." **P.J.P.**, 185 A.3d at 420 (citing **Wiseman**, 718 A.2d at 849). We concluded that this rule contradicted the plain language of the current iteration of the Child Custody Act. Unlike **Wiseman**, Section 5328(a) does not require certain threshold findings before a court may award shared custody. Under the current statute, courts must now consider all relevant factors, including the "ability of the parties to cooperate," when making an award of any form of custody; poor cooperation would not be dispositive. **P.J.P.** at 420. Simply put, the enactment of Section 5328(a) rendered the **Wiseman** analysis obsolete. **Id.**

In **S.T. v. R.W.**, **supra**, we reaffirmed **P.J.P.** and applied its holding to the **legal** custody analysis. The court may only consider those factors set forth in Section 5328(a); the **Yates**-**Wiseman** factors have been assimilated. **See S.T.**, 192 A.3d at 1170.[4]

_____

[4] By contrast, we held that those additional factors unique to cases involving incarcerated parents – commonly referred to as the **Etter** facts – must still be considered in such a custody analysis under Section 5328(a)(16) (any other relevant factor). **S.T.** at 1166-67; **see also M.G. v. L.D.**, 155 A.3d 1083, 1093-94 (Pa. Super. 2017) (citing **Etter v. Rose**, 684 A.2d 1092, 1093 (Pa. Super. 1996) and **D.R.C. v. J.A.Z.**, 31 A.3d 677, 678 (Pa. 2011)).

Instantly, Father argues the court erred by divesting him of shared legal custody, because the record illustrated that the four *Yates*-*Wiseman* factors favored both parties equally. *See* Father's Brief at 31-25. Thus, Father contends that the trial court misapplied the requisite threshold determination, as provided *Wiseman*. The trial court was also under the mistaken belief that legal custody must be decided in accordance with the *Yates*-*Wiseman* factors.[5] Notably, Father does not argue the court erred for considering the *Yates*-*Wiseman* factors; rather, he argues that the *Yates*-*Wiseman* factors support his position. As we stated in *P.J.P.*, and reaffirmed in *S.T.*, the current iteration of the Child Custody Act does not require the court to make a threshold determination before awarding sole or primary custody. Thus, Father's fourth issue merits no relief.[6]

In Father's fifth issue, the focus shifts from legal custody to physical custody. Father argues that the "totality of the facts and evidence of record elicited at trial supported an award of shared physical custody[.]" *See* Father's Brief at 35. He provides a litany of facts, corresponding with each Section 5328(a) factor, which supports his position that shared physical custody was in the best interests of the Children. *See generally id.* at 37-51. Father adds that the trial court erroneously ignored the recommendation of the

_____

[5] Mother was similarly mistaken.

[6] We note here, for the benefit of the parties and the trial court alike, that even if Father properly challenged the legal custody award, we would still conclude the legal award was supported by the record.

- 24 -

psychological custody evaluator, Dr. Marlan, who recommended shared physical custody. *Id.* at 49.

Critically, Father misunderstands our appellate function. When reviewing a custody decision for an abuse of discretion, the question is not whether the record could have supported an alternative custody award – e.g., one advocated by the appellant – but whether the record supports the court's decision. Quite often, the record will also support a contrary result. So much of a custody award depends upon the weight given to each factor, which in turn, depends upon the weight given to evidence and testimony.

As we mentioned above, it is within the trial court's purview, as the finder of fact, to determine which factors are most salient and critical in each particular case. *M.J.M.*, 63 A.3d at 339. On issues of credibility and weight of the evidence, we defer to the findings of the trial court who has had the opportunity to observe the proceedings and demeanor of the witnesses. *A.V. v. S.T.*, 87 A.2d 818, 820 (Pa. Super. 2014) (citation omitted). The parties cannot dictate the amount of weight the trial court places on evidence. *Id.* To that end, the trial court was not required to accept the expert evaluator's recommendation. *See Jacob v. Shultz-Jacob*, 923 A.2d 473, 478-79 (Pa. Super. 2007). The ultimate test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. *S.T.*, 192 A.3d at 1160.

With this standard in mind, we turn to the trial court's rationale behind its award. First, the trial court explained how it weighed certain Section 5328(a) factors:

> I found that Father also limited the Children's communication with their Mother, and spoke disparagingly about her, resulting in Factor 1 favoring Mother. Overall, based on my factor analysis, particularly Factors 9 and 10 – I found it was in the best interest of the Children that Mother have primary custody and that Father's custody time be slightly curtailed during the school year. I also found that the Children were safer with Mother. While I found neither parent to be abusive under Factor 2, I found, as noted, that Father was often neglectful. Additionally, I placed a great deal of weight on Factor 13, the level of conflict between the parties, which my order should serve to reduce.

T.C.O. at 8 (capitalization adjusted) (citations to the record omitted).

We also observe the trial court found Father's testimony to be problematic:

> I also must note…that I often found Father's testimony to be lacking in credibility, which had a significant impact on my findings. At times, I found statements Father made to be simply untrue. At other times, I found that Father sees his actions in a light which is simply unrealistic. Whether he was lying to this court, or to himself is immaterial to me. The relevance to me was that his judgment, whether purposefully or not, was implemented in a way which was harmful to his children, especially N.M.

*Id.* at 7 (footnote omitted).

The court also explained why it did not agree with Dr. Marlan's assessment:

> [Dr. Marlan] referred to Father's parental style as "child-centered, permissive, and easy going." "Free-range, but not irresponsible." I did not agree with her assessment of Father's "style" of parenting, which I found bordered on neglectful. While Mother, who [Dr. Marlan] referred to as "rule-setting," may be hyper-vigilant to some degree, I determined that the Children needed more rules and stability than they receive with Father.

*Id.* at 7-8 (capitalization adjusted) (citations to the record omitted).

The trial court concluded that, in this high-conflict case, its job was not to award custody to the "best" parent as a prize, but to design a custody scheme which best serves the needs of the Children. *Id.* at 8. As these conclusions are not unreasonable as shown by the evidence, we discern no abuse of discretion. Father's fifth issue is without merit.

We turn to Father's final issue, wherein he claims the trial court erred by "failing to explicitly rule on the request for legal custody regarding the religion of the children and/or restricting Father's ability to freely exercise his religion." *See* Father's Brief at 54. Preliminarily, we observe that Father's challenge presents a question of law, and thus our standard of review is now *de novo* and our scope of review in plenary. *See E.C.S.*, 256 A.3d at 454.

Prior to the parties' divorce, the family observed the Jewish faith. Indeed, the parties' initial custody order awarded alternating custody during certain Jewish holidays. Recently, however, Father joined the Unitarian Universalist Church, and he had attended services with the Children. In Mother's counterclaim for custody, Mother filed for sole legal custody regarding the Children's religion. Mother stated: "Over [Mother's] protest, [Father] is introducing, involving and enrolling the Children into a new religion which stands in stark contrast to the religion in which the parties agreed to raise the Children during the marriage[.]" *See* Mother's counterclaim for primary physical and sole legal custody at ¶5(c). In Father's amended petition to modify custody, Father also requested sole legal custody regarding the Children's religion.

The court did not grant either party sole legal custody regarding the Children's religion. However, the court did include Paragraph 1.9(a), which provides:

> Father must continue to cooperate with the Children's participation in the Jewish Faith, as the parties agreed to this when married and enormous efforts have been expended by all.

Order of Court, 3/12/22, at ¶1.9(a).

Before we reach the merits of Father's sixth appellate issue, we note our confusion as to what, precisely, Father seeks to challenge. Contrary to Father's assertion, the trial court explicitly awarded shared legal custody to make religious decisions. Of course, the court included Paragraph 1.9(a), and Father requests this provision be stricken from the order. *Id.* at 57. Thus, we construe Father's argument to mean that Paragraph 1.9(a) restricts his ability "to freely exercise his religion." *Id.*, at 54.

In its Rule 1925(a) opinion, the trial court explains its order does not restrict Father's free exercise of religion, but merely obligates him to cooperate with the Children's participation in Judaism – the family's observed religion before the parents separated. *See* T.C.O. at 13. The court reasoned that nothing in its order restricts Father from taking the Children to worship anywhere he pleases during his custody time. The trial court defended the inclusion of Paragraph 1.9(a), opining:

> While I did not restrict Father's right to practice whatever religion he pleases, I nonetheless felt it important to prevent him from interfering with the religious education of his Children to which Mother has been attending. Due to the

- 28 -

> intractable nature of both parties, but particularly Father, I concluded that he had to be ordered to support their long practiced religious training in Judaism.

*Id.* at 14.

Turning to our relevant precedents, we observe that parent's right to raise a child in accordance with certain religious beliefs has often been referred to as a "hybrid" matter – one that exists at the intersection between the First and Fourteenth Amendments. *See Shepp v. Shepp*, 906 A.2d 1165, 1172 (Pa. 2006) (citing *Employment Div. Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 882 (1990) (reaffirming a higher level of scrutiny for cases involving a free exercise claim made in conjunction with our constitutional protections, such as the right of a parent to direct the upbringing and education of the child). Protections afforded by First Amendment are made applicable to the states through the Fourteenth Amendment. *See, e.g., S.B. v. S.S.*, 342 A.3d 90, 104 (Pa. 2020).

Under the Due Process Clause of the Fourteenth Amendment, a parent has a fundamental right "to make decisions concerning the care, custody, and control of the child." *D.P. v. G.J.P.*, 146 A.3d 204 (Pa. 2016); *and see Troxel v. Granville*, 530 U.S. 57 (2000). Under the Free Exercise Clause of the First Amendment, an individual has a right to religious freedom. *Zummo v. Zummo*, 574 A.2d 1130, 1138 (Pa. Super. 1990); *see also Wisconsin v. Yoder*, 406 U.S. 205 (1972). Read together, parents have the constitutionally protected "right to direct the religious upbringing of their children." *Shepp*, 906 A.2d at 1169 (citing *Yoder* 406 U.S. at 233).

Both the parties and the trial court rely on *Zummo*, *supra*. Although *Zummo* is particularly analogous to the instant case, we note its limited value. While a published opinion, *Zummo* was decided by a three-judge panel which included one concurring vote and one dissenting vote. *See also Shepp,* 906 A.2d at 1178 n.6 (Justice Baer – Dissenting). Nevertheless, we find some of its analysis persuasive, particularly that portion which relies on prior precedent, as we explain *infra*.

In *Zummo*, the mother was raised Jewish and actively practiced her faith since childhood. The father was raised Roman Catholic, but he attended service sporadically. Prior to their marriage, they agreed that any children would be raised Jewish. During their marriage, the parties had three children and were active members in their synagogue and Jewish community. At the time of their separation, the oldest child was preparing for his bar mitzvah and was required to attend preparatory classes each week, to participate in Saturday services, and to attend Sunday school; the middle child was about to begin her formal Jewish education at Sunday school. After separation, the father refused to arrange for the oldest child's religious obligations while exercising his partial custody time. The father also sought to take the children to the occasional Roman Catholic mass as he saw fit; at the time, the children had never been to any service outside of the Jewish faith. *Zummo*, 574 A.2d at 1141.

The trial court prohibited the father from taking the children to any service "contrary to the Jewish faith," and it ordered the father to take the

children to Sunday school during his custody time. The trial court's principal justification was the perceived risk of harm to the children arising from their exposure to a new religion, *i.e.*, that the children would become disoriented or confused by the "contradictory" faiths. The father appealed, arguing that the trial court infringed upon his First Amendment right to free exercise when it prohibited him from instilling his religious beliefs in the children.

This Court agreed. First, we also noted that the parties' prior, informal agreement to raise the children Jewish was irrelevant, as was the father's relative devoutness. *Id.* at 1130, 1152 (citing **JIRB v. Fink**, 532 A.2d 369 (Pa. 1987)). Next, we concluded that any "harm" which might befall the children if they were exposed to Catholicism was patently insufficient to justify government encroachment upon a parent's constitutional rights. *Id.* at 1155.[7] Thus, we vacated the provision of the trial court's order prohibiting the father from taking his children to Catholic mass.

---

[7] When our Supreme Court later decided a similar issue in **Shepp**, it clarified the "harm" that courts must consider when restricting a parent's right to free exercise:

> [A] court may prohibit a parent from advocating religious beliefs, which, if acted upon, would constitute a crime. However, pursuant to **Yoder**, it may do so only where it is established that advocating the prohibited conduct would jeopardize the physical or mental health or safety of the child, or have potential for significant social burdens.

**Shepp**, 906 A.2d at 1174 (citing **Yoder**, 406 U.S. at 233-34).

However, we did **not** vacate that portion of the trial court's order obligating the father to take the children to their Jewish religious classes every Sunday. We stated: "Both parents have rights to inculcate religious beliefs in their children. Accordingly, the trial court may constitutionally accommodate the mother's rights with a directive of the type imposed here, which essentially carves out a time period each Sunday during which the mother had the right to custody and control of the children." **Id.** at 1157 (citing **Rinehimer v. Rinehimer**, 485 A.2d 1166, 1186 (Pa. Super. 1984)).

In **Rinehimer**, we upheld a similar custody order. There, the mother practiced Roman Catholicism and the father practiced Lutheranism. The trial court issued an order awarding the father partial custody every Wednesday and every Friday to Saturday. The father argued that this custody arrangement effectively prohibited him exposing the children to his faith, because he would hardly ever have custody during Sunday church service. **Rinehimer**, 485 A.2d at 1167-1168. In affirming the trial court's custody order, we explained:

> The [trial] court scrupulously avoided any comment which would result in one parent's religious beliefs being favored over the other. The court placed no prohibition upon either parent against taking the children to services of his or her faith, discussing religious beliefs, or in any other way exposing the boys to their respective faiths. Granted, [the father] is effectively prevented from taking his sons to Sunday morning services most of the year. But appellant himself stated that he agreed the boys should be raised [in the mother's Catholic faith] until they were older. We find that the partial custody schedule for the father was not designed to frustrate his religious viewpoint, but was

- 32 -

designed solely in the best interests of the boys in establishing a stable schedule of partial custody.

*Id.* at 1168-69.

Returning to the instant case, Father argues that Paragraph 1.9(a) should be stricken, because Mother was awarded holiday custody time while he was not. But if Father cites his lack of holiday custody time as a reason why he should not have to be burdened by the Paragraph 1.9(a) cooperation mandate, we find such an argument to be inapposite to the issue at hand. And as we noted in ***Rinehimer***, a physical custody order might have the effect of preventing a parent from worshiping with their child, but the order will be upheld where there is no prohibition against their religious upbringing. ***See Rinehimer***, 485 A.2d at 1168-69.

Ultimately, we read the Paragraph 1.9(a) of the custody order – obligating Father to "cooperate with the Children's participation" in Judaism – to be akin to that lawful portion of the ***Zummo*** order directing the father to take the child to bar mitzvah classes. Although the trial court ordered Father to cooperate, the court did not prohibit Father from imparting his religious beliefs in the Children, nor did the court prohibit Father from taking the Children to his religious service during his custody time. ***See also Rinehimer***. Moreover, the trial court explained that its rationale behind Paragraph 1.9(a) had little to do with religion, and more to do with Father's penchant for interfering with Mother's exercise of custody. ***See*** T.C.O. at 14. Because we conclude the trial court did ***not*** restrict Father's ability to inculcate the Children with his religious beliefs, we do not reach the question of whether

the restriction was constitutional. *See Shepp*, 906 A.2d at 1174 (citing *Yoder*, 406 U.S. at 233-34). Our analysis may end here.

Still, we would be remiss not to address Father's holiday argument in more detail, as the same was of particular focus in his Brief and Reply Brief. To the extent Father seeks to raise a **separate** claim – *i.e.*, that the trial court erred when it denied his request for holiday custody but awarded Mother the same – we conclude this issue is waived for the following reasons.

Pennsylvania Rule of Appellate Procedure 2116(a) provides that "[t]he statement of the questions involved must state concisely the issues to be resolved, expressed in the terms and circumstances of the case but without unnecessary detail." Pa.R.A.P. 2116(a). "No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby." **Id.** Although the formally stated question will be deemed to include every subsidiary question fairly comprised therein, we have said that this Court cannot conduct a meaningful review if it must guess what issues an appellant is appealing. **C.H.L. v. W.D.L.**, 214 A.3d 1272, 1278 (Pa. Super. 2019) (citing Pa.R.A.P. 2116(a)).

The specific claim Father presents in this appeal is whether the trial court failed "to explicitly rule on the request for legal custody regarding the religion of the children and/or restricting Father's ability to freely exercise his religion in violation of the First Amendment of the United States." **See** Father's Brief at 22. Father's ultimate request is that Paragraph 1.9(a) be

stricken from the order and that shared legal custody regarding religion be granted to the parties. *See id.* at 56.

First, we do not construe the denial of Father's holiday custody to be a subsidiary issue of whether the trial court failed to explicitly rule on legal custody. Section 5322 defines "legal custody" as "the right to make major decisions on behalf of the child, including, but not limited to, medical, **religious**, and educational **decisions**." 23 Pa.C.S.A. § 5322 (emphasis added). Here, the court clearly awarded both parents shared legal custody to make religious decisions on behalf of the Children. Father's request for holiday time was a request for "physical custody" – that is, "[t]he actual physical possession and control of a child." *Id.* The question of physical custody is not "fairly suggested" by the question of legal custody. *See* Pa.R.A.P. 2116(a).

Second, we do not find the question of whether Father is entitled to his own holiday time to be a subsidiary question of whether the court may properly mandate Father's cooperation in Children's participation in Mother's faith. Evidently, the trial court did not even think to address the holiday physical custody issue in its Rule 1925(a) opinion. There is no nexus between the court's mandate that one parent cooperate in a child's participation in a religious practice and the court's denial of a request for holiday custody time.

Perhaps there is nexus between a First Amendment infringement claim and an award of holiday physical custody, but we decline to proclaim one based on Father's ambiguous suggestion. In other words, we will not guess or speculate that this is what Father meant to argue. *See C.H.L.*, *supra.* "It

is not the duty of this Court to act as appellant's counsel, and we decline to do so." **C.H.L..**, 214 A.3d at 1277. Moreover, "[i]t is not the prerogative of an intermediate appellate court to enunciate new precepts of law or to expand legal doctrines. Such is a province reserved to the Supreme Court." **Matter of M.P.**, 204 A.3d 976, 986 (Pa. Super. 2019) (citation omitted).

To be clear, we acknowledge Father's argument concerning holiday time is tied to **Zummo** and not spun from whole cloth. The **Zummo** Court posited, in *dicta*, that a custody order which awards a Christian parent custody during Christian holidays, but does not award the Jewish parent custody during Jewish holidays might "constitute an impermissible restriction on religious and parental rights, and a violation of the Establishment Clause, albeit an indirect one." **Zummo**, 574 A.2d at 1157-58. But the **Zummo** holding has limited precedential value (as we mentioned above), its *dicta* even less. Thus, contrary to Father's characterization in his Brief, this Court has not forbidden a trial court from granting one parent's request for religious holidays without acknowledging the other's. **See** Father's Brief at 56.

Absent further guidance from our Supreme Court, we are not entirely convinced the "hybrid" constitutional analysis is necessary in every custody dispute between parents. It certainly can be, as demonstrated in **Shepp, supra.** But there, the constitution was implicated because the trial court (*i.e.*, the government) regulated the content of the parent's speech, when it prohibited the father from speaking to the child about polygamy and Mormon

fundamentalism. *See Shepp*, 906 A.2d at 1174.[8]  Put another way, the law is not so developed on these matters, making it is obvious to us that the holiday custody claim is "fairly suggested" by the explicit issue Father raised in his Brief.  Thus, insofar as Father meant to raise a separate claim regarding his denied request for holiday time, we conclude Father circumvented Pa.R.A.P. 2116(a) and that the issue is waived.

To conclude: the trial court did not based its Section 5328(a) determinations on gender preferences; the trial court erred when it took judicial notice of the symptoms and treatment of ADHD, but the error was harmless; the trial court did not have to make a threshold determination before awarding sole legal shared custody, because the current iteration of the Child Custody Act has superseded the decisions in *Yates* and *Wiseman*; the trial court did not abuse its discretion as to its physical custody award, as its conclusions were not unreasonable in light of the record; the trial court did

_____

[8] *But see id*. at 1174-75 (Justice Eakin – Concurring) ("With parents in conflict concerning how [the] daughter should be raised in this regard and with each having an equivalent fundamental right to direct [the] daughter's upbringing, I would conclude the fundamental rights of one parent are not superior to the fundamental rights of the other.  For analytical purposes, they "cross-out" one another, leaving us with an analysis based on the best interests of the child – the hallmark of every custody matter – without applying strict scrutiny.  Applying strict scrutiny to the trial court's order based upon [the] father's First Amendment rights gives him a tremendous advantage in the custody dispute over whether [the] daughter should be taught about plural marriage, since the strict scrutiny test is rarely met.").

not infringe on his First Amendment right to free exercise when it ordered Father to cooperate with the Children's participation in Judaism.[9]

Order affirmed. Application for further costs denied. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/24/2022

---

[9] Mother has filed an application for further costs in which she takes issue with Father's "willful failure" to include certain documents in his reproduced record, thereby forcing her to incur the costs of preparing and filing supplemental reproduced records. In his answer, Father denies Mother's claim. This Court had requested and reviewed the certified record in this appeal. Mother's application for further costs is denied.