J-A22025-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| ANTHONY DINICOLA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DOROTA GRYCZEWSKI | : | |
| | : | |
| Appellant | : | No. 1095 EDA 2025 |

Appeal from the Order Entered April 9, 2025
In the Court of Common Pleas of Delaware County Civil Division at
No(s): CV-2020-005029

BEFORE: LAZARUS, P.J., LANE, J., and STEVENS, P.J.E.*

MEMORANDUM BY LANE, J.: **FILED DECEMBER 12, 2025**

Dorota Gryczewski ("Mother") appeals from the custody order awarding: (1) Anthony DiNicola ("Father") primary physical custody of the parties' daughter, L.D. ("Child"), born in 2019, during the school year; (2) Mother partial physical custody of Child on the first three consecutive weekends every month; and (3) the parties shared physical custody on a rotating weekly basis during the summer. The order further directed the parties to enroll Child in the Rose Tree Media School District for the 2025-2026 school year and thereafter. We affirm the order, in part, and reverse, in part.

The factual and procedural history of this matter is not in dispute. The parties enjoyed shared legal and shared physical custody of Child pursuant to a custody order entered in December 14, 2022, whereby Father had physical

_____

* Former Justice specially assigned to the Superior Court.

custody of Child Monday through Wednesday, Mother had physical custody of Child Wednesday through Friday, and the parties alternated custody of Child on weekends.[1]  On April 15, 2024, upon agreement of the parties, a custody order was entered which granted Mother's request to relocate with then four-year-old Child from Folsom, in Ridley Township, Delaware County, to Feasterville-Trevose, in Bucks County.  Father resided in the Borough of Media, in Delaware County.[2]

In September 2024, Father filed a petition to modify the existing custody order wherein he requested primary physical custody.  In response, Mother filed a petition to modify custody "and/or to determine" where Child will attend school starting in the fall of 2025, when she would be in kindergarten.  On March 31, 2025, the trial court conducted a hearing on the petitions during which the parties testified with respect to their custody requests.  Specifically, they both testified that if the other party relocated in closer proximity to their home, they would agree to maintaining the shared physical custody award. **See** N.T., 3/31/25, at 97-98, 141.

Father testified that he has resided in the same one-bedroom apartment in Media for approximately four years, which is located in the Rose Tree Media

_____

[1] Mother appealed the December 14, 2022 custody order, and this Court affirmed it.  **See DiNicola v. Gryczewski**, 304 A.3d 765 (Pa. Super. 2023) (unpublished memorandum).

[2] The record reveals that the commuting time between the parties' homes is "30, 45 minutes, depend[ing] on the traffic."  N.T., 3/31/25, at 22.

School District. *See* N.T., 3/31/25, at 110. Father also owns a house in Ridley Township, Delaware County ("the Ridley house"), which his tenant occupies. *See id*. at 111-12. Father explained that he prefers to rent in Media rather than live in the Ridley house for financial reasons and because "it's also just a phenomenal place to live . . . and [offers] a lot . . . of walkability." *Id*. at 112-13. In addition, Father testified that Media is "15 minutes away" from Tinicum Elementary School, in the Interboro School District, where he has been employed as a teacher for approximately twenty years. *Id*. at 113.

Mother testified that, since 2011, she has owned a house in Feasterville, Bucks County ("the Feasterville house"), in the Neshaminy School District, where she resides with Child and her ten-year-old son from a different relationship, over whom she has primary physical custody. *See id*. at 12-13. When Mother first met Father, she was living in the Feasterville house with her son, and Father lived in a rental property in Media. *See id*. at 115. Mother became pregnant with Child soon after meeting Father, and the parties desired to cohabit in the Ridley house. *See id*. Mother sought and was granted an order in the custody action pertaining to her son, who was then approximately five years old, which permitted him to relocate with her to the Ridley house. *See id*. at 37-38.

As best we can discern, the parties lived together in the Ridley house until their relationship ended sometime within the first year of Child's life. *See id*. at 115. Father then returned to Media, but Mother and her son remained

- 3 -

in the Ridley house, and the parties shared physical custody of Child pursuant to the December 14, 2022 custody order. Mother's living arrangement gave rise to Father filing an ejectment action against her at a time unspecified in the record. Ultimately, Mother and her son returned to the Feasterville house after the trial court entered the stipulated April 15, 2024 custody order.

On April 9, 2025, the trial court entered an order which awarded: (1) Father primary physical custody during the school year and directed that Child be enrolled in the Rose Tree Media School District; (2) Mother partial physical custody on the first three consecutive weekends every month; and (3) the parties shared physical custody on a rotating weekly basis during the summer. The order further provided that, if Mother moved to Delaware County, the parties "shall have shared physical custody on a rotating weekly basis" during the school year. Order, 4/9/25, at ¶ 21. In addition, the order maintained the parties' shared legal custody award, but provided that Father "shall enroll" Child with a pediatrician and dentist located in Delaware County in September of 2025, "with immediate written notice to Mother." *Id*. at ¶ 30. The trial court accompanied the order with a written assessment of the custody factors pursuant to 23 Pa.C.S.A. § 5328(a). *See id*. at 18-23. Mother filed a timely notice of appeal, as well as a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court then authored an opinion pursuant to Rule 1925(a).

Mother presents the following issues for our review:

1. Did the trial court err as a matter of law and abuse its discretion by underemphasizing Child's sibling relationship with Mother's other child?

2. Did the trial court err as a matter of law and abuse its discretion by over-emphasizing Father's alleged stability and ability to provide continuity in Child's life and by under-emphasizing Father's bad faith actions which forced Mother to move to a different county?

3. Did the trial court err as a matter of law and abuse its discretion by granting Father absolute discretion in Child's elementary school, pediatrician, and dentist, despite granting both parties "shared legal custody" in [the subject] order?

4. Did the trial court err as a matter of law and abuse its discretion by over-restricting the parties' ability to communicate with one another and/or contact the authorities, thereby infringing upon their 1st Amendment rights?

5. Did the trial court err as a matter of law and abuse its discretion by over-restricting the parties' ability to modify [the subject] order, thereby infringing upon their 14th Amendment rights?

Mother's Brief at 8 (cleaned up, issues reordered for ease of disposition).

We review Mother's issues according to the following scope and standard of review:

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

> ***R.M.G., Jr. v. F.M.G.***, 986 A.2d 1234, 1237 (Pa. Super. 2009) (*quoting **Bovard v. Baker***, 775 A.2d 835, 838 (Pa. Super. 2001)).  Moreover,
>
>> [O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.
>>
>> The parties cannot dictate the amount of weight the trial court places on evidence.  Rather, the paramount concern of the trial court is the best interest of the child.  Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.
>
> ***R.M.G., Jr.***, ***supra*** at 1237 (internal citations omitted).  The test is whether the evidence of record supports the trial court's conclusions. ***Ketterer v. Seifert***, 902 A.2d 533, 539 (Pa. Super. 2006).

***A.V. v. S.T.***, 87 A.3d 818, 820 (Pa. Super. 2014).

We have explained, "[i]t is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, giv[ing] due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion. . . ." ***King v. King***, 889 A.2d 630, 632 (Pa. Super. 2005) (citation omitted).  This Court has recognized that "the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record." ***Ketterer,*** 902 A.2d at 540 (citation omitted).

With respect to custody cases, the primary concern is the best interests of the child.  "The best-interests standard, decided on a case-by-case basis,

considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual wellbeing." *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006) (*citing* *Arnold v. Arnold*, 847 A.2d 674, 677 (Pa. Super. 2004)).

Child custody actions are governed by the Child Custody Act ("Act"), 23 Pa.C.S.A. §§ 5321-5340. In this case, the trial court was required to consider Child's best interests pursuant to section 5328(a), which sets forth sixteen factors that the trial court must consider when awarding custody:

> **(a) Factors.**--In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving substantial weighted consideration to the factors specified under paragraphs (1), (2), (2.1) and (2.2) which affect the safety of the child, including the following:
>
> (1) Which party is more likely to ensure the safety of the child.
>
> (2) The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.
>
> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
>
> (2.2) Violent or assaultive behavior committed by a party.
>
> (2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.
>
> (3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's developmental stage, maturity and judgment.

(8) The attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child. A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party. A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

> (15) The mental and physical condition of a party or member of a party's household.
>
> (16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).[3]

This Court has explained that all of the factors listed in section 5328(a) are required to be considered by the trial court when entering a custody order. *See A.V.*, 87 A.3d at 822.  As the finder of fact, the trial court determines "which factors are most salient and critical in each particular case." *E.B. v. D.B.*, 209 A.3d 451, 468 (Pa. Super. 2019) (citation omitted).

Instantly, the trial court weighed section 5328(a)(4) and (16) in Father's favor, and it "slightly" weighed [s]ection 5328(a)(13) in his favor.  Order, 4/9/25, at 22.  With respect to Mother, the court weighed only section 5328(a)(6) in her favor because of her son, who is approximately five years older than Child, whereas Father has no other children.  The court equally weighed between the parties section 5328(a)(1), (2.3), (3), (5), and (9) – (12), and it found inapplicable section 5328(a)(2) – (2.2), (7), (8), (14), and (15).

_____

[3] Our General Assembly amended section 5328(a) on June 30, 2025, with an effective date of August 29, 2025.  Since the subject proceedings occurred before the effective date of the amendments, they did not apply here. *See R.M. v. J.S.*, 20 A.3d 496, 513 n.15 (Pa. Super. 2011) (declining to apply revised version of statute in proceedings that concluded in the trial court several months prior to the effective date of the at-issue legislation).

We set forth the trial court's assessment of the factors in favor of Father, beginning with section 5328(a)(16), which provides that the court considers any other relevant factor. Here, the court determined that the Rose Tree Media School District "is more highly rated" than the Neshaminy School District. Order, 4/9/25, at 23. The parties do not dispute this factual finding. *See* N.T., 3/31/25, at 172 (Mother's counsel stating during closing argument that the Rose Tree Media School District "ranks out higher than" the Neshaminy School District).

With respect to section 5328(a)(4), the child's need for stability and continuity, the court found, in relevant part:

> Although Mother is entitled to live in any home or location that she chooses, including [the Feasterville house], she may have failed to consider the possibility that Child would not be permitted to attend school in that location, which would require Child to be moved again. Unfortunately, the parties were unable to work together to make a long-term plan for Child's education, which is generally attributable to their highly toxic relationship. Regardless, Father has maintained a residence in the Rose Tree Media School District for multiple years and has established an appropriate level of residential stability. . . .

*Id*. at 20 (cleaned up).[4]

Finally, with respect to section 5328(a)(13), the level of conflict between the parties, the trial court found "that both parties have contributed to a

---

[4] In its consideration of the custody factors, the trial court erroneously stated that the Feasterville house is located in Montgomery County, rather than Bucks County. We deem this error without consequence to the court's custody award.

historically high level of conflict. . . ." *Id*. at 22. However, since the December 14, 2022 custody order, which first established the awards of shared physical and legal custody, the court found that

> Father has improved in his communication with Mother, in that there was no evidence that he was engaging in petty and unproductive co-parenting. Mother, on the other hand, persists in engaging in controlling behaviors that serve no purpose relative to Child's best interests. Her constant berating and questioning of Father about minor issues seriously calls into question whether she is even capable of co-parenting. Although Father's responses to her texting "inquisitions" could have been less defensive, his attitude toward Mother's harassing behavior is reasonably understandable. There was no evidence that Mother has made any effort since December 2022 to be reasonable, cooperative, patient or accommodating. . . .

*Id*. (cleaned up).

Turning to Mother's first and second issues, she argues that the trial court abused its discretion by failing to place greater weight upon section 5328(a)(6) and by finding that section 5328(a)(4) favored Father. Mother points out that the trial court considered Child's relationship with her half-brother under section 5328(a)(6) and concluded that it favored Mother. However, rather than placing determinative weight on this factor, the trial court instead placed determinative weight, in part, upon section 5328(a)(4), which concerns the need for stability and continuity in the child's education, family and community life. Mother argues that the court abused its discretion with respect to this factor by "under-emphasizing Father's bad faith actions" related to the ejectment action he filed against her. Mother's Brief at 45. The crux of her claim is that Father is responsible for her relocation from Delaware

County to the Feasterville house. Mother contends, therefore, that the court erred in finding her less stable under section 5328(a)(4).

The trial court considered Mother's first and second issues and concluded that they lacked merit. The trial court explained:

> Mothers [first] two claims are that this trial court underemphasized [C]hild's sibling relationship, over-emphasized Father's alleged stability, and underemphasized Father's bad faith actions, however, this trial court afforded all of the evidence on these three issues the weight that it believed was appropriate in light of [C]hild's best interests and this trial court's discretionary authority should not be overturned simply because Mother views the evidence differently.

Trial Court Opinion, 5/12/25, at 7.

Based on our review, we discern no abuse of discretion by the trial court in reaching its custody determinations regarding section 5328(a)(4) and (a)(6). Father explained that, prior to filing the ejectment action, he had offered Mother the chance to lease the Ridley house for, as best we can discern, $1,200 per month, which she rejected. *See* N.T., 3/31/25, at 116. Father testified that he filed the ejectment action because Mother "was claiming squatter's rights." *Id*. Father revealed, "I have since asked my attorney to drop" the ejectment action. *Id*. The trial court stated on the record in open court that it was aware of Father's "bad faith actions" in this regard and considered it in the context of this custody case, as follows.

> The court is not unfamiliar with these folks. The court has had these folks for years, multiple listings. Do they co-parent well? No. Do they communicate well? No. Are there levels of controlling or manipulation on the part of both of them? Yes. The

court has already made those determinations. Do they bicker over petty things? Yes. . . .

* * * *

***And this is a case where Father was looking to evict or get a judgment against the mother of his child in the house that he let her live in.*** There is pettiness, there is manipulation, there is controlling on both sides. . . .

***Id***. at 58 (cleaned up, emphasis added). Thus, the record is clear that the trial court considered Father's conduct in this regard in fashioning the custody order. ***See id***. As explained above, the law is well-settled that we must defer to the trial court with respect to its determinations on credibility and weight of the evidence. Thus, we defer to the trial court's conclusion that section 5328(a)(4) should be weighted in favor of Father because he has maintained stability by residing in the Rose Tree Media School District for multiple years. Accordingly, as we discern no abuse of discretion, Mother is not entitled to relief on first and second issues.

In her third issue, Mother argues that the trial court abused its discretion by "granting Father absolute discretion" in determining Child's elementary school, as well as her pediatrician and dentist providers, despite awarding the parties shared legal custody. ***See*** Mother's Brief at 37. We review these claims *ad seriatim*.

The relevant provision of the custody order regarding Child's elementary school is as follows:

25.   Child shall be enrolled in the Rose Tree Media School District for the 2025-2026 school year and thereafter shall not be

- 13 -

disenrolled without an order of court or express written agreement between the parties.

  a. Child shall attend to the elementary school which is assigned to Father's address as of the date of enrollment or the first day of school.

Order, 4/9/25, at ¶ 25.

Mother asserts that Father requested during the custody hearing that Child attend Media Elementary School, but the court erroneously "expanded" his request "to the entire school district." Mother's Brief at 39. Relevant to this claim is Father's testimony that his current lease would expire at "the end of August," which was approximately five months from the date of the hearing. N.T., 3/31/25, at 111. Father testified:

Q. And when your lease terminates at the end of August, what are your plans as far as housing?

A. The plans as far as housing is this summer to be looking to rent a home, [or] buy a home in the Rose Tree Media School District, or, at the least, have a two-bedroom apartment.

Q. And a two-bedroom apartment specifically where?

A. In the Rose Tree Media School District.

*Id*. Father explained that he could choose to lease a two-bedroom apartment in the same building where he leased his one-bedroom apartment. *Id*. at 158.

The trial court considered the educational aspect of Mother's third issue and provided the following response thereto:

  Paragraph 25 clearly states that Child shall attend the elementary school assigned to Father's neighborhood by the Rose Tree Media School District. Mother is aware of Father's home address and evidence was entered of his neighborhood school;

- 14 -

therefore, it would be rather simple for her to ascertain which school the child will attend based on that residency. Mother also has the right to exercise her shared legal custody and object if Father changes his residence resulting in Child attending a school of which Mother had no prior knowledge or which she believes is appropriate for Child's educational needs.

*Id*. at 5-6 (cleaned up; numerical paragraphs omitted).

We discern no abuse of discretion by the trial court directing that Child be enrolled in the Rose Tree Media School District without designating the specific elementary school that Child will attend within that school district. Father testified to his plans to relocate to a larger apartment or to a home within the same school district — the Rose Tree Media School District —upon the expiration of his present lease. Thus, the trial court's decision to provide Father with some flexibility in selecting the specific school that Child will attend within that district does not reflect an abuse of the court's discretion.

With respect to Mother's claim that the trial court abused its discretion in directing Father to enroll Child "with a Delaware County pediatrician and dentist" in September of 2025, she points out that neither party "asked for Child to be unenrolled from her current care providers in favor of ones that were more local to Father's home." Mother's Brief at 38. The relevant provision of the custody order provides as follows.

30. Child shall remain enrolled with her current pediatrician and dentist until September 2025, when Father shall enroll her with a Delaware County pediatrician and dentist with immediate written notice to Mother.

Order, 4/9/25, at ¶ 30.[5]

The trial court stated that it fashioned the relevant provision "in light of the historical evidence of extreme animosity between the parties." Trial Court Opinion, 5/12/25, at 6. Specifically, the court stated that "it is necessary that one parent, in this case the primary custodial parent, be permitted to select Child's pediatrician and dentist, over what should be a very simple decision, but again, if Mother has any issue with Father's selection, she can object through a filed petition." *Id*. (cleaned up).

We conclude that the trial court erred to the extent it did not recognize that Child was already enrolled with pediatric and dental providers located in Delaware County, and that neither party requested changing them. Father testified that Child's pediatrician was the Children's Hospital of Philadelphia located in Springfield, and that her dentist was located in Havertown. *See*

---

[5] By way of further background, the order provides:

> 33. Parents shall yearly alternate responsibility for scheduling pediatric and dental wellness/routing appointments for child.
>
> a. Odd year: Mother, even year: Father.
>
> b. Scheduling parent shall immediately text other parent appointment information.
>
> c. Other parent's inability to attend an appointment shall not be cause to cancel or reschedule said appointment.

Order, 4/9/25, at ¶ 33.

N.T., 3/31/25, at 116. As best we can discern, these providers were already located in Delaware County, and Father testified that both he and Mother took Child to her medical appointments. *See id*. at 116-17. As such, we are constrained to reverse paragraph 30 of the order.

In Mother's fourth issue, Mother asserts that the trial court abused its discretion by "over-restricting the parties' ability to communicate with one another, their child, and/or contact the authorities." Mother's Brief at 24. Mother points to the following provisions of the custody order:

**CO-PARENTING & COMMUNICATION**:

1. Parents shall not contact each other for any reason other than the following and any reason specifically allowed in this Order:

   a. Legal custody issue

   b. Imminent medical emergency involving the child.

2. Parents shall communicate solely in writing by text or email for all custody related issues.

3. Neither parent shall block the other parent on their personal cell phones.

4. Receiving parent shall respond to any written message sent in a timely fashion, however, the sending parent shall not berate, intimidate or harass the other parent as the result of failure to respond.

5. Parents shall make **all** reasonable efforts to engage in productive, patient and respectful contact regarding legal custody matters . . . for the sake of the child's best interests, not their own, including but not limited to the restrictions herein.

**PROHIBITED CONDUCT**:

6. Neither parent shall contact the police regarding legal or physical custody related issues unless there is an imminent medical emergency, suspected criminal activity, or danger of physical injury, harm or violence to the child, a parent or any other individual involved with the child.[1]

\* \* \* \*

9. Neither parent shall include in any text or email message any of the following, unless there is an imminent with the child, criminal activity or reasonably suspected physical safety/danger issues in other parent's home:

   a. Interrogation or opinions about other parent's household routines.

   b. Advice, opinions, or criticism of parenting skills and methods.

   c. Opinions about the condition of the other parent's home, on the medical emergency with the child, criminal activity or reasonably suspected physical safety/danger issues in other parent's home.

   d. Comments about paramours and family members.

\* \* \* \*

12. Neither parent shall, verbally or in writing, interrogate or question the child about the other parent any individual in the other parent's household, other parent's household routines, opinions about the other parent's conduct, except if parent has reasonable suspicion of physical abuse, criminal activity or imminent medical emergency.

_____

[1] This does not preclude or limit either parent from filing a Protection from Abuse Petition on behalf of the child, from filing a Childline complaint, or contacting Delaware County CYS.

_____

Order, 4/9/25, at ¶¶ 1-6, 9, 12 (emphasis and footnote in original).

Mother concedes that the trial court "may . . . infringe in a parent's protected speech, if it protects a minor's well-being from psychological and physical harm, which serves a compelling state interest." Mother's Brief at 29 (*citing* **Shepp v. Shepp**, 906 A.2d 1165, 1172 (Pa. 2006)). Nevertheless, Mother argues that the trial court intended by these provisions "to protect Father's feelings from Mother's criticism or his parenting and cleanliness." **Id**. at 32. Mother then reasons, "[t]he court does not have the authority to protect Father's psychological well-being, thus the clauses prohibiting the parties' communications were judicial overreach." **Id**. Mother insists that, by including these restrictions on the parties' communications, the court infringed upon the parties' guarantee of freedom of speech pursuant to the First Amendment of the United States Constitution. **Id**. at 28.

The trial court considered Mother's fourth issue and determined that it lacked merit, reasoning as follows.

> The trial court assessed all the evidence presented of the high conflict level . . . and concluded that restrictions were necessary to ensure to the highest degree possible that [the parties'] co-parenting would not continue to be hampered by the history of discord. As such, it was necessary to ensure that the parents limit their contact to custody[-]related matters and that they communicate in a healthy and productive manner for the sake of [C]hild's best interests, which they have wholly failed to do thus far. . . . The trial court also found that the evidence supported limiting the parties' contact with law enforcement to issues of physical injury, danger or violence as it is not in [C]hild's best interests to witness or be subjected to unnecessary police intervention. . . . Additionally, there is no history of violence with the parents or [C]hild, therefore, it is not reasonable to assume that the police would need to intervene in a custody case absent a physical danger. . . . Finally, the restriction on contacting law

enforcement is limited to custody[-]related issues and does not preclude either parent from contacting the police about issues unrelated to [C]hild. . . .

Trial Court Opinion, 4/9/25, at 3-5 (numerical paragraphs omitted).

Based on our review of the record, we discern no abuse of discretion by the trial court in including the subject restrictions on the parties' future communications. Notably, Father testified to the following:

Q. [H]ow is it co-parenting with [Mother]?

* * * *

A.     It's very hard.  It's very difficult.  I tried to keep it polite, kind, just about [Child].  When it comes the other way [from Mother], it's not that.   I'm constantly being accused of things. I'm constantly being texted what I did wrong, or [Child] is dirty or that I didn't give her medicine.  Then, . . . when I go to ask a question, it's normally met with either no response, a question to my question, or a no.  So[,] it's very, very hard.

And[,] I also am intentional about not trying to do [to Mother] what's done to me because I know it's not in [Child]'s best interest to have parents going back and forth.  . . .

N.T., 3/31/25, at 134, 137.  Father testified that he could not remember ever questioning Mother about her parenting of Child during her exercise of physical custody.  *See id*. at 138.

Father also presented the trial court with a series of text message exchanges with Mother wherein she questioned him about Child.  *See* N.T., 3/31/25, at 161-66.  For instance, Father testified on cross-examination with respect to a photo that Mother sent him, as follows.

Q. The photo that your attorney offered as an exhibit in this case, where [Mother] sent you a photo and said, "[Child's] face is filthy,"

- 20 -

and your response to [Mother] was to say that taking a photograph of [Child] was "traumatic," correct?

A. Yeah, in the manner in which it was done.

* * * *

I'm saying that when we just did [a custody] exchange, and I just told [Mother] that we had just had tacos, and she doesn't say anything, but I go back inside my apartment, . . . [Mother] then takes a picture of [Child] in the car with taco sauce, which I just told [Mother] why, and [Mother] sends [the photo and text message]. And makes [Child] sit there and have that picture taken, and then [on] the drive home [Child] hears all these bad things about her dad.

*Id*. at 164.

Father additionally testified about an incident when he and Child attended a Phillies' game, and they spoke to Mother immediately before the game via FaceTime. *Id*. at 160. Father explained that, upon hanging up the phone call, "I get these multi-paragraph texts [from Mother] about . . . not drinking diet soda . . . because she saw [Child] take a sip of my diet soda on FaceTime." *Id*. at 160. Father explained:

And then [Mother] continues on. And, again, we were at the Phillies game. It was firework night. And then . . . [Mother] gets into talking about co-parenting or I'm giving [Child] sugary foods . . . .

Q. Do you often give your daughter soda?

A. No. I mostly give her water, okay? I'm not going to say it [was] the only time that she [has] ever had a sip of Diet Coke.

*Id*. at 160.

- 21 -

Based upon Father's testimony, which the trial court credited, as well as the totality of the record evidence, we discern no abuse of discretion by the trial court in concluding that paragraphs 1-6, 9, and 12 of the order were necessary for Child's best interests. Indeed, to the extent that Mother argues the provisions violated her freedom of speech under the First Amendment to the United States Constitution, she has failed to make her case. As such, Mother's fourth issue fails.

In her final issue, Mother contends that the court abused its discretion "by over-restricting the parties' ability to modify" the subject order, thereby infringing upon their 14th amendment right." Mother's Brief at 32. In advancing this argument, Mother points to the following provision in the custody order:

> 18. Neither parent shall attempt in any way to modify the terms of this Order or to attempt to influence the [C]hild to defy or fail to cooperate with the physical custody terms in any manner.

Order, 4/9/25, at ¶ 18. Mother baldly asserts that the order "is meant to constrict [her] from modifying any terms, and not Father, as it is written to provide him with primary physical custody and no duty to co-parent with" her. Mother's Brief at 33. Mother claims that, in this way, the order violates her guarantee of due process under the Fourteenth Amendment to the United States Constitution. *See id*.

The trial court considered Mother's fifth issue and determined that it lacked merit, reasoning as follows:

It is well-established that a parent can file a petition for modification at any time during the pendency of custody litigation and no term of the final custody order was intended to prevent or limit that right. Paragraph 18 is solely intended to prevent the parents from unilaterally modifying the order separate and apart from the established court process, an action which can, and usually does, result in increased confusion, animosity and ineffective co-parenting, and taking into account the contentious history between these parents, would not result in a situation in the child's best interests.

Trial Court Opinion, 5/12/25, at 5 (cleaned up; numerical paragraphs omitted).

Based on our review, we discern no abuse of discretion by the trial court in including the language of paragraph eighteen in its custody order. A long-standing principle in the Commonwealth is that "petitions for modification of custody orders may be filed at any time, and in all such cases the court hearing the petition must consider the best interests of the child . . .." *Martin v. Martin*, 562 A.2d 1389, 1391 (Pa. 1989). Mother's argument that, by including paragraph eighteen, the trial court intended to prevent her from filing any future petition for modification is simply without merit. Instead, the paragraph appears to be intended to prevent either party from attempting to modify the terms of the custody order except through established legal methods for challenging such orders. Accordingly, Mother's fifth issue merits no relief.

In sum, we conclude that the trial court carefully and thoroughly considered Child's best interests in fashioning the custody order. Accordingly, we affirm the physical and legal custody awards, as well as the determination

- 23 -

that Child will attend school in the Rose Tree Media School District. However, we reverse paragraph 30 of the order because the evidence does not support Father unilaterally changing Child's pediatrician and dental providers in September of 2025 to different providers in Delaware County, inasmuch as the existing providers were already located in Delaware County, and neither party requested changing them.

Order affirmed, in part. Order reversed **solely** with respect to paragraph 30. Case remanded for the trial court to enter a new custody order in accordance with this memorandum. Jurisdiction relinquished.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/12/2025